Filed 5/27/15  Certified for publication 6/23/15 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re the Marriage of KERI EVILSIZOR and JOSEPH SWEENEY. | |
| KERI EVILSIZOR, | A142396 |
| Respondent, | |
| v. | (Contra Costa County Super. Ct. No. MSD1301648) |
| JOSEPH SWEENEY, | |
| Appellant. | |

Appellant Joseph Sweeney downloaded the contents of respondent Keri Evilsizor's cell phones around the time Evilsizor gave birth to the couple's daughter. After these dissolution proceedings were initiated a few months later, Sweeney filed with the court copies of some downloaded text messages. Evilsizor sought a restraining order under the Domestic Violence Prevention Act (DVPA) to stop Sweeney from further disseminating the downloaded information.[1] After taking testimony and finding that Sweeney's actions amounted to abuse under the DVPA, the trial court prohibited Sweeney from distributing the information without first receiving the court's permission. We conclude that the order did not violate Sweeney's constitutional rights to free speech, and we therefore affirm.

---

[1] The DVPA is found at Family Code, section 6200 et sequitur. All statutory references are to the Family Code unless otherwise specified.

1

I.

FACTUAL AND PROCEDURAL
BACKGROUND

Evilsizor and Sweeney were married in November 2010. Evilsizor used two phones during her marriage to Sweeney: one for the "legal side" of her business and another for the "management side" of her business that she also allowed her young son from a previous relationship to use for playing games. Sweeney claimed that he had regular access to both phones "for the purpose of taking pictures, sending e-mail, text messages, browsing the Internet, or using applications," and that the phones were not password protected. He also claimed that Evilsizor gave him the password to her e-mail account so that he could send e-mails for her and have "full access" to her e-mail. Evilsizor disputed these claims.

Evilsizor gave birth to the couple's daughter in November 2012. Around this time, Sweeney became concerned that he might not be the child's biological father after he read a text message on his stepson's phone leading him to believe that Evilsizor had received fertility treatments without his knowledge. He then downloaded the contents of Evilsizor's phones using software that made it easier to read the information.[2] Sweeney obtained tens of thousands of text messages from the phones as well as information from the "notes" section of Evilsizor's iPhone, which Evilsizor used as a diary. He testified he thought it was unnecessary to get Evilsizor's permission before downloading the data or to tell her he had done it after the fact because he had regular access to the phones and had "previously backed up the phone to the computer" at her request. Evilsizor denied ever asking Sweeney to back up data on her phones and denied knowing he had done so.

Sweeney ultimately spent about 20 to 30 hours reviewing the text messages he downloaded. In January or February 2013, he confronted Evilsizor with information he had learned from her text messages. In March, he went uninvited to the home of

---

[2] Sweeney testified he downloaded the data at some point in late November or early December 2012. Evilsizor testified that the date on the last text message obtained by Sweeney was on the night she gave birth to their daughter and that Sweeney had taken her phones from her while she was in labor.

Evilsizor's parents and disclosed private and sensitive information about Evilsizor to her father.[3] Evilsizor was "very upset and shocked" when she learned of the disclosure.

That month, the parties separated, and dissolution proceedings were soon initiated. Disputes arose over various issues, and the trial court has characterized this as a "highly contentious case." One such dispute was over child and spousal support, as well as the sharing of costs for a custody evaluation. On August 30, 2013, Evilsizor filed a request to increase Sweeney's support payments on the ground that her income had decreased because her father had fired her from her job with his (the father's) company. In opposing this request, Sweeney alleged that Evilsizor had colluded with her parents to falsely make it appear she had been fired.

Sweeney attached text messages to his declaration supporting his opposition. One was from October 2012 (before these proceedings began) meant to demonstrate that Evilsizor was misstating the assets at her disposal. The text message that appears in the record is illegible, but it apparently refers to three cases of diamond rings Evilsizor owned. Another text message was dated January 2010, when Evilsizor was in litigation with her son's father over the custody of her son (Sweeney's stepson). Part of the printout of the message that appears in the record is also illegible, and the text that is legible appears benign, at least when read out of context (i.e., "Keri, I'm on the train. Text works. Whassup gir? [*sic*]"). But according to Sweeney, the message (apparently,

---

[3] The information Sweeney disclosed to Evilsizor's father was personal and sensitive, but it was not information Sweeney had learned from the downloaded text messages. At oral argument in this court, Sweeney faulted the trial court to the extent it relied on incidents where his behavior was supposedly unrelated to his downloading of information from Evilsizor's phone. We consider the evidence probative of whether Sweeney was prone to disclosing extremely sensitive information about his estranged wife, whatever the source of the information.

the portion that is illegible in the record) demonstrated that Evilsizor "could manipulate her property interests" and finances.[4]

In response to her text messages being used as exhibits, Evilsizor filed a request for a restraining order under the DVPA. She alleged that Sweeney had downloaded her private text communications to third parties, including her attorney, without her consent, and had hacked into her Facebook account, changed her password, and rerouted the e-mail associated with her Facebook account to his own account. Evilsizor claimed that as a result she suffered "extreme embarrassment, fear, and intimidation." She also alleged that Sweeney threatened to reveal publicly more text messages and e-mails for leverage in the dissolution proceedings. She sought an order prohibiting Sweeney from further disseminating her text messages and e-mails, requiring Sweeney to return all electronically downloaded information he had accessed along with hard copies of the messages, and barring Sweeney from accessing or interfering with her internet-service provider or social-media accounts.

At some point during discovery, Sweeney provided to Evilsizor a USB drive containing about 11 to 12 gigabytes of data he had retrieved from her phones. He objected to providing the data in a different format, claiming it would constitute about 219,000 printed pages.

The trial court initially declined to issue a temporary restraining order but indicated it would address the matter at a hearing on November 12, later continued to November 18. At the November 18 hearing, the court set a trial date on the DVPA petition for the following summer, on July 1, 2014. During a discussion of possible interim orders, Sweeney's counsel stated he objected to any order "that would sound like it's a DV [domestic-violence] order. So if there's a stipulation outside of a DV order,

---

[4] At a subsequent and unrelated hearing, the trial court disagreed at least somewhat with this characterization of the message. The court viewed the communication as "barely admissible" and did not consider the subject "central to this case at all." On November 5, 2014, this court granted Sweeney's unopposed request to augment the record to include the reporter's transcripts of hearings held on April 17 and July 16, 2014, after the issuance of the DVPA order.

that's fine." Counsel contended that Sweeney should be allowed to share "whatever he wishes" with the custody evaluator but that he would agree there was "no need nor purpose in distributing any of those [messages] to anyone else." After further discussion, the trial court issued an interim order prohibiting Sweeney from disseminating information protected by the attorney-client privilege. Regarding the rest of the information, the court noted it was "optimistic that the parties are truly going to be able to work out whether or not they want to truly have a full-day hearing on a restraining order request of this nature. I'm hoping that the hearing will not be necessary."

The trial court's optimism was misplaced. The day after the November 18 hearing, Sweeney's attorney wrote to Evilsizor's attorney stating he was looking forward to a draft of a "*Non* DV Stipulation & Order regarding the orders that Keri sought since that Hearing was continued to July 1, 2014." Although the letter suggested that Evilsizor's attorney had offered to draft such a stipulation, apparently no one ever drafted one.

In December 2013, Sweeney provided the custody evaluator with text messages regarding fertility treatments Evilsizor underwent during their marriage and messages about previous boyfriends. Sweeney provided the messages in order, in his words, to counter the "false version of our marriage" presented by Evilsizor to the evaluator. Evilsizor and others then wrote to the evaluator asking her not to consider the messages. Although the custody evaluator's written response is not in the appellate record, it is clear the evaluator wrote to the trial court requesting guidance on how to proceed.

The case was ultimately assigned to a new trial judge after Evilsizor's parents, who had been joined as parties to the proceedings, filed a peremptory challenge to the original judge (Code Civ. Proc., § 170.6). The new judge issued a minute order rescheduling various matters, but initially kept the July 1 date for the contested hearing on the DVPA petition. Then, at a hearing on March 7, 2014, the parties discussed the rescheduled dates, as well as how the court should respond to the custody evaluator about the text messages that Sweeney had submitted. The court said the evaluator should not look at any information retrieved from cell phones until the DVPA petition was resolved,

and it expressed interest in holding a hearing on the petition before July 1 so the parties would know sooner what material could be used. The court stated it had availability on March 25, but Sweeney, who at this point was representing himself, stated, "I would prefer to have counsel, and Mr. Loewenstein [Sweeney's previous attorney] is out of country March 20th to April 10th." The trial court confirmed that Mr. Loewenstein was no longer representing Sweeney on the DVPA petition and stated it preferred a March date instead of waiting until July. Sweeney again objected he would need more time because he was representing himself, and he asked whether it would be possible "to move it back to April some time." After further discussion, the trial court agreed that March 25 was "short notice" for Sweeney and offered the afternoon of April 11 instead. Sweeney responded, "Okay."

Sweeney, Evilsizor, and Evilsizor's father[5] testified at the April 11 hearing. Evilsizor testified that it had been "incredibly incredibly difficult to deal with" the dissemination of her personal information, stating, "I have sleepless nights. I'm sick to my stomach. My friends are mad at me, embarrassed as if I let him. I didn't know he was even doing any of this. My parents are upset, you know. Why did I marry him? I didn't know that things were going—I didn't know. Yeah. It's been incredibly challenging to live with." She further testified that she had suffered shock and embarrassment and feared for her safety because of the disclosure. Evilsizor also was concerned about Sweeney's threats to reveal information to the Internal Revenue Service about "things [she] didn't do."

After the close of evidence, the trial court remarked that the narrow issue to decide was whether there was a need to prevent dissemination of the information from Evilsizor's phones. It stressed, "I'm not making any conclusive decision about whether they [the text messages] were properly acquired. I'm not deciding what [e]ffect it has on

---

[5] On October 28, 2014, this court affirmed an award of sanctions against Evilsizor's father for failing to timely withdraw a motion to quash. (*Evilsizor v. Sweeney* (2014) 230 Cal.App.4th 1304, 1306.) A separate appeal of an order awarding Sweeney attorney fees is currently pending. (No. A143054.)

6

attorney/client privilege or on the presence of [Sweeney's former attorney] in the case."[6] The court concluded that even if Sweeney legally obtained Evilsizor's information, an issue left unresolved, it was authorized under the DVPA to enjoin the disclosure or threats of disclosure of the information to protect Evilsizor's peace of mind. The court ordered Sweeney be "prohibited from using, delivering, copying, printing or disclosing the messages or content of [Evilsizor's] text messages or e-mail messages or notes, or anything else downloaded from her phone or from what has been called the family computer except as otherwise authorized by the court." Sweeney also was prohibited from trying to access or otherwise interfere with Evilsizor's internet-service provider accounts or social-media accounts. The trial court's order expires on April 11, 2019. Sweeney timely appealed.

## II.
### DISCUSSION

A. *The Applicable Law and the Standard of Review.*

At the time Evilsizor sought and obtained the restraining order, the DVPA authorized a trial court "to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved" if evidence showed "reasonable proof of a past act or acts of abuse." (Former § 6300.)[7] A court may issue an order enjoining specific acts of "abuse" (§ 6218, subd. (a)), which are defined as, among other things, behavior that could be enjoined under section 6320. (§ 6203, subd. (d).) Section 6320, in turn, permits a court to enjoin a party from engaging in various types of behavior, including "disturbing the peace of the other party." (§ 6320,

---

[6] At the time the trial court ruled on Evilsizor's DVPA petition, Evilsizor had a pending motion to disqualify Sweeney's former attorney and to sanction him for allegedly disseminating privileged communications between Evilsizor and her attorney. The request ultimately was denied by order dated July 16, 2014.

[7] Portions of the DVPA were amended effective January 1, 2015. (Stats. 2014, ch. 635.) Some provisions remain unchanged, and the changes that did go into effect do not alter our analysis of the issues in this case. But in the interest of clarity, our citation to sections of the DVPA are to the version in effect during proceedings in the trial court except when otherwise noted.

subd. (a).)  "[T]he plain meaning of the phrase 'disturbing the peace of the other party' in section 6320 may be properly understood as conduct that destroys the mental or emotional calm of the other party."  (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1497 (*Nadkarni*).)  The phrase includes "destroying the mental or emotional calm of [a former spouse] by accessing, reading and publicly disclosing her confidential e-mails."  (*Id.* at p. 1498.)

We review an order granting a protective order under the DVPA for abuse of discretion.  (*Nadkarni*, *supra*, 173 Cal.App.4th at p. 1495.)  In considering the evidence supporting such an order, "the reviewing court must apply the 'substantial evidence standard of review,' meaning ' "whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted," supporting the trial court's finding.  [Citation.] "We must accept as true all evidence . . . tending to establish the correctness of the trial court's findings . . . , resolving every conflict in favor of the judgment." '  [Citation.]"  (*Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1143.)

*B.  Sweeney's Actions Constituted "Abuse" Under the DVPA.*

We first reject Sweeney's argument that the trial court misapplied *Nadkarni*, *supra*, 173 Cal.App.4th 1483 in determining that Sweeney's actions constituted "abuse" under the DVPA.  In *Nadkarni*, a former wife alleged that her ex-husband had accessed her private e-mail account while she was away on a business trip, then attached copies of the e-mails to documents filed in proceedings regarding custody of their teenaged children.  (*Id.* at pp. 1487-1488.)  She sought a permanent restraining order, but the trial court denied it without a hearing after finding that the DVPA did not cover situations in which there was no physical harm alleged.  The appellate court reversed and remanded the matter to the trial court for a hearing.  It held that the definition of abuse under the DVPA is not limited to the infliction of physical injury or assault.  (*Id.* at pp. 1498, 1501.)

Both parties cited *Nadkarni, supra,* 173 Cal.App.4th 1483 below, and the trial court relied on it in ruling that it was not necessary for Evilsizor to prove physical abuse to obtain a restraining order and that "the disclosure of various communications can constitute disturbing the peace of the other party within the meaning of the domestic

8

violence statute." The court ultimately concluded that Sweeney had disturbed Evilsizor's peace under *Nadkarni*, "because you're going around either disclosing or threatening to disclose to third parties for no particular reason intimate details of your lives, . . . and that's what I think is happening here."

Sweeney's attempts to distinguish this case from *Nadkarni* are unpersuasive. We disagree with him that there is a meaningful distinction between *Nadkarni*'s assumption that the ex-wife's e-mails were "confidential" and the trial court's finding here that Sweeney had disclosed "intimate details of [the parties'] lives." We also are not persuaded by Sweeney's point that, unlike here, there were allegations of past physical abuse in *Nadkarni*. (173 Cal.App.4th at p. 1496.) Although a lack of past physical abuse may be considered by a trial court in considering a protective order, the DVPA's definition of abuse "is not confined to physical abuse but specifies a multitude of behaviors which does not involve any physical injury or assaultive acts."[8] (*Eneaji v. Ubboe* (2014) 229 Cal.App.4th 1457, 1464; see also *Burquet v. Brumbaugh*, *supra*, 223 Cal.App.4th at pp. 1142-1143, 1146-1147 [substantial evidence supporting DVPA restraining order where there was no evidence of physical abuse, but restrained party disturbed peace of ex-girlfriend by e-mailing her, sending her text messages, and showing up unannounced at her home]; *Conness v. Satram* (2004) 122 Cal.App.4th 197, 201-202 [no evidence of physical injury needed under DVPA].)

Sweeney's reliance on *S.M. v. E.P.* (2010) 184 Cal.App.4th 1249 is also misplaced. In that case, the appellate court concluded, without analyzing the "disturbing the peace" definition of "abuse" (§ 6320, subd. (a)), that the trial court's description of the restrained party's behavior did not support a finding of abuse. (*S.M.*, at p. 12604.) In fact, the trial court's statement that it would wait to see if there were "more incidents" before it relied on the presumption under section 3044, subdivision (a) that child custody would not be in the best interests of the restrained person's child suggested the trial court

---

[8] Following an amendment to section 6203 that took effect January 1, the DVPA now specifically provides that "[a]buse is not limited to the actual infliction of physical injury or assault." (§ 6203, subd. (b); Stats. 2014, ch. 635, § 2.)

9

believed the restrained person "would have to engage in some *additional* behavior before the court would find that he engaged in domestic violence." (*S.M.*, at p. 1268, original italics.) Here, by contrast, the trial court specifically found that Sweeney's behavior fell within the DVPA.

At oral argument before this court, Sweeney suggested that his conduct was not sufficiently egregious to warrant the entry of the DVPA order, especially since the order will have the particularly serious consequence of creating a rebuttable presumption in the ongoing child-custody dispute that his child's best interest would not be furthered by him being awarded custody. (§ 3044.) But the presumption is rebuttable by a preponderance of the evidence, and we believe that the trial court can and will properly consider and weigh the evidence in the child-custody proceedings to determine whether it should be overcome, taking into account factors that may be favorable to Sweeney (§ 3044, subds. (a)-(b)), understanding that there was no finding Sweeney was physically violent, and focusing on the best interest of the child. The trial court previously has acknowledged the applicable rebuttable presumption at a hearing on April 17, 2014, when it stated that section "3044 says what it says. There is an automatic presumption. It's not a separate finding that I make. *That presumption can be rebutted*. And we will go through all of that at the appropriate time." (Italics added; see also *Keith R. v. Superior Court* (2009) 174 Cal.App.4th 1047, 1056 [domestic-violence orders "often must issue quickly and in highly charged situations" but should not be "misuse[d] . . . for tactical reasons"].)

We also reject Sweeney's argument that insufficient evidence supports the trial court's order. To be sure, the parties disputed certain aspects of the events that led to the issuance of the restraining order, and Sweeney highlights on appeal his version of events. But the trial court was in the best position to evaluate credibility and to resolve factual disputes, and our review of the record reveals sufficient evidence to conclude that the

court's order was not an abuse of discretion.[9] (*Burquet v. Brumbaugh*, *supra*, 223 Cal.App.4th at p. 1143.)

### C. The Trial Court's Order Is Not an Improper Prior Restraint of Sweeney's Constitutional Rights to Free Speech.

Sweeney next argues that the restraining order is an improper prior restraint of his rights to free speech under the federal and California constitutions. We reject this argument because Sweeney's ability to continue to engage in activity that has been determined after a hearing to constitute abuse is not the type of "speech" afforded constitutional protection.

The First Amendment to the United States Constitution provides: "Congress shall make no law . . . abridging the freedom of speech . . . ." "This fundamental right to free speech applies to the states through the Fourteenth Amendment's due process clause." (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 133-134 (plur. opn. of George, C.J.) (*Aguilar*).) " '[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights.' [Citation.] 'The term prior restraint is used "to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur." [Citation.] . . . . [P]ermanent injunctions—i.e., court orders that actually forbid speech activities—are classic examples of prior restraints.' " (*DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 886, original italics.) " 'The special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment.' " (*Ibid.*, quoting *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations* (1973) 413 U.S. 376, 390.)

"Although stated in broad terms, the right to free speech is not absolute." (*Aguilar*, *supra*, 21 Cal.4th at p. 134.) " '[T]here are categories of communication and

---

[9] Sweeney contends that in denying a separate restraining order he sought against Evilsizor, the trial court "held the parties to a double standard on the issue of domestic violence." But Sweeney did not appeal from that order, and it is irrelevant to our review of the order giving rise to this appeal.

certain special utterances to which the majestic protection of the First Amendment does not extend because they "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." ' " (*Balboa Island Village Inn, Inc. v. Lemen* (2007) 40 Cal.4th 1141, 1147 (*Lemen*), quoting *Bose Corp. v. Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 503.) Such categories include libelous speech (*Lemen,* at p. 1147) and words amounting to employment discrimination (*Aguilar,* at pp. 134-135, 141-142).

Similarly, prohibiting Sweeney from disseminating the contents of Evilsizor's phones does not amount to a prohibited restraint of protected speech because Sweeny's conduct constituted "abuse" under the DVPA. (§§ 6203, subd. (d), 6218, subd. (a), 6320, subd. (a).) Sweeney places far too much emphasis on the fact that the trial court specifically declined to address whether Sweeney *illegally* obtained information from Evilsizor's phones. Regardless whether the data was acquired legally, the trial court was authorized to conclude that its dissemination as we have described was abusive under the DVPA and *not* the type of speech afforded protection under the First Amendment. (*Lemen*, *supra*, 40 Cal.4th at p. 1147.)

*Bartnicki v. Vopper* (2001) 532 U.S. 514, upon which Sweeney relies, does not compel a contrary conclusion. There, an unidentified person unlawfully intercepted and recorded a telephone call between the president of a local teachers union and a union negotiator involved in contract negotiations with the school board, and several media outlets published the contents of the recording even though they knew or had reason to know the conversation had been illegally obtained. (*Id.* at pp. 518-519.) The Supreme Court held that under the circumstances the valid privacy interests in a private conversation gave way to the First Amendment protection of truthful speech about a matter of *public concern.* (*Id.* at pp. 533-535.) The court specifically declined to address whether the First Amendment would protect unlawfully intercepted messages concerning "domestic gossip or *other information of purely private concern.*" (*Id.* at p. 533, italics added.) "In doing so, the court recognized that the First Amendment interests served by

the disclosure of purely private information . . . are not as significant as the interests served by the disclosure of information concerning a matter of public importance." (*DVD Copy Control Assn., Inc. v. Bunner*, *supra*, 31 Cal.4th at p. 883 [affirming preliminary injunction enjoining party from posting on the Internet trade secrets regarding licensed DVD encryption technology].) Here, Sweeney has not identified any public concern in Evilsizor's text messages and other information that he surreptitiously took from her phones.

Sweeney's comparison of this case to situations where parties obtain information from independent sources also misses the mark. He relies on *In re Marriage of Candiotti* (1995) 34 Cal.App.4th 718, where the trial court entered an order barring an ex-wife in a custody-and-visitation proceeding from disseminating information obtained about her ex-husband's new wife that was acquired both during discovery and also from independent sources. (*Id.* at pp. 719-721.) Division Three of this court affirmed the portion of the order protecting disclosure of material obtained through discovery. (*Id.* at p. 726.) As for the portion of the order banning dissemination of material acquired through independent sources, however, the court reversed, holding that the order infringed on the ex-wife's freedom to speak freely about another adult. (*Id.* at pp. 724-725.) Although it is not entirely clear how the ex-wife obtained the objectionable information, there was no suggestion that it was obtained improperly. (*Id.* at pp. 720-721 [ex-wife "investigated . . . allegations" learned through anonymous telephone call and "obtained information about [new wife's] driving and personal history"].) Here, by sharp contrast, the trial court determined that Sweeney "committed acts that are restrainable under the [DVPA]." Whether this was a reference to the way in which the data was gathered or the manner in which Sweeney disseminated (or threatened to disseminate) it, we do not believe this abusive conduct is the sort of "independently secured information" to which the *Candiotti* court afforded constitutional protection. (*Id.* at p. 722.)

Furthermore, the trial court determined that Sweeney's actions amounted to abuse under the DVPA *after* a contested hearing. This distinguishes the present case from those in which trial courts enjoined speech *before* a determination was made that the speech

13

was unprotected. For example, in *Evans v. Evans* (2008) 162 Cal.App.4th 1157 the appellate court reversed the issuance of a *preliminary injunction* that prohibited a party from publishing certain statements about her former husband, because the injunction was overbroad and amounted to an invalid prior restraint *before trial*. (*Id.* at pp. 1161-1162; see also *Gilbert v. National Enquirer, Inc.* (1996) 43 Cal.App.4th 1135, 1145-1146 [preliminary injunction entered before trial that prohibited ex-husband from discussing allegedly defamatory comments about his former spouse, a famous actress, amounted to invalid prior restraint].) The *Evans* court emphasized, however, that a court may prohibit a party from repeating statements *determined at trial* to be defamatory, because defamatory statements are not subject to protection under the First Amendment. (*Evans*, at p. 1162.) Here, the trial court entered an order *after* a contested hearing where it determined Sweeney committed abuse under the DVPA.

This approach is consistent with well-settled First Amendment jurisprudence. "[A]n injunctive order prohibiting the repetition of expression that ha[s] been judicially determined to be unlawful d[oes] not constitute a prohibited prior restraint of speech." (*Lemen*, *supra*, 40 Cal.4th at p. 1153.) For example, following a court trial in *Lemen*, the trial court determined that the defendant had defamed a restaurant and bar, and it entered a permanent injunction prohibiting the defendant from repeating the defamatory statements. (*Id.* at pp. 1144-1146.) The Supreme Court held that "an injunction issued following a trial that determined that the defendant defamed the plaintiff that does no more than prohibit the defendant from repeating the defamation, is not a prior restraint and does not offend the First Amendment." (*Id.* at p. 1148.) " 'Once specified expressional acts are properly determined to be unprotected by the first amendment, there can be no objection to their subsequent suppression or prosecution.' " (*Id.* at p. 1156.) Likewise in *Aguilar*, *supra*, 21 Cal.4th 121, the Supreme Court held that where there has been a judicial determination that the use of racial epithets constitutes employment discrimination, an injunction prohibiting the continued use of those slurs does not violate the right to freedom of speech and does not amount to a prohibited prior restraint of speech. (*Id.* at pp. 126, 140.)

14

This result also is consistent with the California Constitution. Article I, section 2, subdivision (a) of the state constitution provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right." Our Supreme Court has observed that this provision " 'is terse and vigorous, and its meaning so plain that construction is not needed. . . . It is patent that this right to speak, write, and publish, cannot be abused until it is exercised, and before it is exercised there can be no responsibility.' " (*Lemen*, *supra*, 40 Cal.4th at pp. 1159-1160, quoting *Dailey v. Superior Court* (1896) 112 Cal. 94, 97.) But despite the broad language in the California Constitution protecting speech, our Supreme Court has recognized that courts may enjoin speech that has been found *at trial* to be unlawful. (*Lemen,* at p. 1160.) The injunction here does not violate the state constitution because it was entered only after a contested hearing that resulted in a determination that Sweeney's allegedly protected conduct in fact amounted to abuse.

"We recognize, of course, that a court must tread lightly and carefully when issuing an order that prohibits speech." (*Lemen*, *supra*, 40 Cal.4th at p. 1159.) " 'An order issued in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order. In this sensitive field, the State may not employ "means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." [Citation.] In other words, the order must be tailored as precisely as possible to the exact needs of the case.' " (*Ibid.*, quoting *Carroll v. Princess Anne* (1968) 393 U.S. 175, 183-184.) Sweeney contends the court's order is unnecessary, but he does not direct his challenge to the wording of the court's final order. Instead, he emphasizes that the parties once discussed entering into a stipulation regarding the use of Evilsizor's text messages. Sweeney faults *Evilsizor* for not drafting a stipulation, but he directs us to nothing in the record showing *he* drafted an acceptable alternative to a

15

protective order.[10]  He also points to stray comments the trial court made when issuing the order about how it might be interpreted, but the language used by the court was not included in the final order and thus is not helpful in analyzing it.  (*Jespersen v. Zubiate-Beauchamp* (2003) 114 Cal.App.4th 624, 633 [judge's comments at oral argument may never be used to impeach final order].)

We are somewhat more sympathetic, however, to Sweeney's passing argument that the trial court's order is overbroad.  The order prohibits Sweeney from "using, delivering, copying, printing or disclosing the messages or content of [Evilsizor's] text messages or e-mail messages or notes, or anything else downloaded from her phone or from what has been called the family computer . . . ."[11]  As we construe the order, it is directed at Evilsizor's data that Sweeney surreptitiously *downloaded*.  Sweeney contends the order could be interpreted as prohibiting him from using text messages that he himself exchanged with Evilsizor, but we disagree.  If a text message appears on *Sweeney's own* phone, nothing in the order prevents him from disclosing it (assuming it appears on his phone because he received it, and not because he later downloaded it from Evilsizor's phone).  We acknowledge that a prohibition on "disclosing" the "content" of Evilsizor's text messages could arguably cover information that Sweeney knew independently of the review of Evilsizor's information.  But given that the order is directed only at the data Sweeney "downloaded," we believe the order was sufficiently tailored to the harm it was

---

**10** At oral argument, Sweeney again blamed Evilsizor for not pursuing his proposed stipulation by drafting a proposed agreement.  He contended that the trial court should not have entered the DVPA order because it was unnecessary in light of his willingness to stipulate that he would not publish the data he downloaded from Evilsizor's phone.  Regardless whether the dispute could have been resolved without a DVPA order, the failure of the parties to effectuate a settlement left the trial court with no option other than to rule on the motion.  And at a subsequent hearing, the trial court stressed the order was more than a protective order:  "I was very clear [at the DVPA hearing].  It's a domestic violence restraining order. . . .  It's a DV order."

**11** The order provides that Sweeney may not take these actions "except as otherwise authorized by the court," making clear that although Sweeney is not to use the material he obtained from Evilsizor without her knowledge or consent, he may still seek the court's permission to use it for whatever purpose.

16

meant to prevent—namely, disclosing or threatening to disclose the information. Under these circumstances, the court's protective order does not violate Sweeney's right to free speech.

### D. The Trial Court's Handling of Procedural Issues Was Proper.

Finally, we reject Sweeney's arguments that the trial court's handling of the proceedings below amounted to reversible error. He first contends that the trial court abused its discretion when it "advanced the trial date and did not allow [him] to retain counsel," a reference to the discussions on March 7, 2014, about holding the hearing on the DVPA sooner than scheduled so the court could advise the custody evaluator about the possible use of the text messages when conducting her evaluation. (Boldface omitted.) But as set forth above, the trial court actually *granted* Sweeney's request to hold the hearing in April instead of March as originally proposed, and Sweeney responded, "Okay," when the court set the hearing for April 11. Sweeney has not demonstrated error or prejudice because he agreed to the trial court's scheduling and selected date.

Sweeney next claims that the trial court violated his right to cross-examine Evilsizor on matters within the scope of direct examination. (Evid. Code, § 773, subd. (a) [cross-examination permitted on any matter within scope of direct examination].) In his opening brief, he does not articulate any specific legal error arising out of cross-examination. At oral argument, he highlighted his cross-examination of Evilsizor when he asked her whether he had disclosed text messages to anyone other than their custody evaluator. After Evilsizor responded she did not know all the people to whom he had supplied the text messages, Sweeney asked, "Have I contacted any of your third parties, whether it be friends, family, or other associates?" Evilsizor responded, "Yes. You've written letters to them, and you told them in your letters to not get involved or you would produce more text messages." Following a discussion with the court over whether Evilsizor had seen such letters and a question from Sweeney about "the context in which I was responding to the people who wrote to Doctor Lee in an attorney-like context," the trial court stated, "I think this is getting beyond what we need to know to decide today's

17

issue, okay. [¶] Do you have anything else, Mr. Sweeney?" Sweeney responded, "I think that's the extent of my cross-examination."

We find no error in the foregoing exchange. Sweeney cross-examined his estranged wife without the assistance of an attorney in a high-conflict case, and he did not articulate at the time why further cross-examination was necessary. Although the trial court also redirected Sweeney at other points, we can find nothing in the record to support a conclusion that it abused its discretion in doing so.

### III.
### DISPOSITION

The trial court's order is affirmed. Evilsizor shall recover her costs on appeal.

_____
Humes, P.J.

We concur:

_____
Dondero, J.

_____
Banke, J.

18

Filed 6/24/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

KERI EVILSIZOR,

      Plaintiff and Respondent,

v.

JOSEPH SWEENEY,

      Defendant and Appellant.

A142396

(Contra Costa County
Super. Ct. No. MSD1301648)
ORDER GRANTING PUBLICATION
AND DENYING REHEARING

BY THE COURT:[12]

      The opinion in the above-entitled matter filed on May 27, 2015, was not certified for publication in the Official Reports. After the court's review of requests under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105, it is hereby ordered that the opinion should be published in the Official Reports.

      The petition for rehearing by appellant is denied.

Date: _____        _____P.J.

---

[12] Before Humes, P.J., Dondero, J., and Banke, J.

1

Trial Court:                        Contra Costa County Superior Court

Trial Judge:                       Honorable Edward G. Weil

Counsel for Appellant:       Joseph Sweeney, in pro. per.

Counsel for Respondent:     Ronald G. Peck, Schenone & Peck