Filed 12/4/23  Marriage of Bray CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of CHRISTINA and JONATHAN BRAY. | |
| CHRISTINA BRAY, Plaintiff and Respondent, v. JONATHAN BRAY, Defendant and Appellant. | F084865 (Super. Ct. No. 19CEFL04990) **OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Fresno County.  Glenda S. Allen-Hill, Judge.

McCormick, Barstow, Sheppard, Wayte & Carruth, Todd W. Baxter for Appellant.

Christina Bray, in pro. per., for Respondent.

-ooOoo-

--------

[*]    Before Peña, Acting P. J., Meehan, J. and Snauffer, J.

Appellant Jonathan Bray appeals the trial court's issuance of a three-year domestic violence restraining order (DVRO). The DVRO contains personal conduct and stay-away orders protecting Christina Bray.[1] Jonathan contends the trial court abused its discretion by issuing the DVRO because there was insufficient evidence he committed "abuse" under the Domestic Violence Prevention Act (DVPA) (Fam. Code, § 6200 et seq.).[2] Jonathan further contends the court applied an incorrect standard for determining whether Jonathan "disturbed the peace" of Christina. We affirm the order.

## FACTUAL AND PROCEDURAL SUMMARY

### A.  The Marriage, Dissolution and Child Custody

Jonathan and Christina were married in January 2019 and separated in April 2019. Christina petitioned for dissolution of the marriage on August 26, 2019. Her petition stated there was one minor child who was not yet born. Christina gave birth to a son, L., on January 18, 2020. By order dated February 11, 2020, the parties agreed to joint custody of L. with Jonathan given visitation of L. once a week for no more than three hours. On June 27, 2020, the trial court entered a notice of entry of judgment for the dissolution of the marriage.

On February 2, 2022, the trial court issued an order modifying Jonathan's visitation with L. to one weekend a month, with the weekend to be the last of the month in the event of a disagreement. L. was to be exchanged at a specific coffee shop in Fowler.

### B.  Request for DVRO

On March 23, 2022, Christina filed a request for a DVRO against Jonathan. Christina requested protection for herself, her two older children and her dog. Christina

---

[1]  We use the parties' first names hereafter because they have the same last name. No disrespect is intended.

[2]  Further undesignated statutory references are to the Family Code.

2.

alleged ongoing abuse by Jonathan from 2019 to 2022 in the form of text messages, questioning, accusations, apologies, manipulation, unsolicited gifts, stalking, and invasion of privacy. Christina suspected Jonathan had surveillance on her because he had known information about her life and where she was going without Christina telling Jonathan or posting on social media. Her request alleged five incidents of abuse detailed below in chronological order.

On April 24, 2021, Jonathan was visiting L. from out of state. While Jonathan was at Christina's house, he purportedly got Christina's phone and looked through her text messages. Jonathan saw text messages between Christina and a person she was dating. Jonathan later harassed Christina in person, via text message and on the phone about this person. Jonathan knew information about this person that was not identifiable from the text messages including the person's full name and business. Jonathan initially denied to Christina that he looked at her messages, but later apologized for invading her privacy.

On July 24, 2021, Jonathan was watching L. while Christina was scheduled to be at an event until 10:00 p.m. Jonathan was supposed to drop L. off at Christina's residence. At approximately 8:00 p.m., Jonathan text messaged Christina he was on the way to her house. Christina left the event early to retrieve L. When Jonathan saw Christina in her garage, he kept hugging Christina tightly and grabbing her hands, begging her to be with him and saying how much he missed her. Christina was holding L. and kept asking Jonathan to leave and stop touching her. Jonathan did not leave for 15 minutes until L. woke up and started crying. When Jonathan returned the next day, he asked Christina if "Trina" was her partner.

On September 5, 2021,[3] Christina and Jonathan had agreed Jonathan would return

---

[3]    The DVRO request gives a date of "9/5/22" for this incident, which is presumed to be a typo because the request was filed on March 23, 2022. Jonathan "assumed the year is '2021' " and we assume the same.

L. to Christina's residence after she did a 13-mile hike. Christina was supposed to call Jonathan on her cell phone to give an estimate on her return time. Christina used her friend Trina's phone to call Jonathan because Christina did not have service on her own phone. Jonathan frantically asked Christina who she was hiking with and whose phone she was using. When Christina refused to tell Jonathan who she was with, Jonathan refused to bring L. to her house. Christina called the police who called Jonathan to obtain the address where Christina could pick L. up.

Christina believed Jonathan entered her home and took several items that were of significance to Jonathan the week of December 27, 2021.[4] Specifically, Christina alleged Jonathan took from her home: custody court papers, a fireplace remote Jonathan had given her, snow boots and a beanie she wore on their wedding day, and Christina's wedding band. Christina discovered these items were missing later. Christina further alleged that Jonathan had previously taken her wedding ring, snow boots and beanie, and later returned them.

On December 31, 2021, Jonathan arrived at Christina's residence to return L. Jonathan walked into Christina's house uninvited and began walking around the living room and kitchen while making comments to Christina about making sure she was watching L. and not on her phone. Christina had previously told Jonathan on April 24, 2021, that he was not allowed to enter her house after he had snooped on her phone. Jonathan left after about 10 minutes. Christina text messaged Jonathan immediately after he left to remind him that he was never to enter her house.

C. **Response to Request for DVRO**

Jonathan filed a response to Christina's request for a DVRO. Jonathan attached a copy of an incident report from the Fowler Police Department. The report stated that on

---

**4** The DVRO request gives a date of both "12/27/21" and "12/27/22" for this incident. We again presume the correct year is 2021 because the request was filed on March 23, 2022.

4.

March 25, 2022, Jonathan and Christina met at the designated coffee shop for Jonathan to pick up L. for his visit. Christina handed L. to Jonathan and Jonathan began to walk back to his car with L. L. cried a little as Jonathan walked away. Christina wanted L. back, but Jonathan refused and told Christina to get back in her car. As Jonathan was putting L. in the car seat, Christina tried to get between Jonathan and L. to take L. out of the car. Christina could not get L. out and went around to the other car door. Jonathan's youngest daughter was sitting on that side of the car. Christina opened the car door and climbed over Jonathan's youngest daughter to get L. Jonathan repeatedly told Christina to get out of the car. Christina told Jonathan she wanted to hold L. and comfort him. Jonathan allowed Christina to get out and hold L. Christina then put L. back in her car and drove off. Jonathan called 911. Two police officers arrived at the scene. Christina returned and the officers spoke with both Jonathan and Christina. Jonathan was able to leave with L. after filing an incident report.

Jonathan also attached an incident report from the Clovis Police Department dated March 17, 2022. Christina reported to the police that she believed Jonathan entered her home through either a garage door opener or an unlocked door to steal certain items including snow boots, a hat, and her wedding ring. Christina noticed the items were missing when she was going through her closet on the weekend. She believed Jonathan took these items when he was in Clovis at an unknown time to visit L. Christina later got cameras for her house and changed the garage door opener and locks. She did not want the police to contact Jonathan. Christina just wanted documentation of the incident because she was seeking a restraining order.

### D. The DVRO Hearings

The trial court conducted hearings regarding Christina's request over three days: April 14, 2022, May 5, 2022, and June 30, 2022. On April 12, 2022, Christina submitted to the court text messages between her and Jonathan, and three incident reports from the Clovis Police Department in support of her request.

### 1. The April 14, 2022 Hearing

At the initial hearing, Christina told the trial court that she had submitted 11 pages of text messages plus three incident reports. The court noted these documents were "pending filing with the [c]ourt." Jonathan told the court he had not received copies of these additional items, only Christina's initial filing. The court was inclined to continue the hearing to provide additional time for Christina to serve these documents on Jonathan. Christina expressed concern that Jonathan would be coming at the end of the month to pick up L. Jonathan noted to the court the incident on March 25, 2022, when Christina took L. from his car. Based on this incident, the court ordered supervised exchanges for L. Christina was to select the agency for the exchanges from a list of approved providers. Christina asked if she could get a temporary restraining order, but the court stated, "it was denied."

### 2. The May 5, 2022 Hearing

At the second hearing, Jonathan confirmed he was served with additional documents from Christina. The trial court proceeded to obtain evidence from both parties.

#### a) Text Messages

On April 25, 2021, Jonathan text messaged Christina that he "left a message to apologize for the way [he] acted earlier." He wrote "there are issues of jealousy that [he] need[s] to work through." Christina responded that she has an issue with Jonathan invading her privacy by looking through her text messages. Jonathan denied looking at her messages or invading her privacy and wrote that he "guess[es] what [he] heard was right" about Christina dating someone. Christina responded that she believed Jonathan was lying. Christina messaged Jonathan that she is "serious about [Jonathan] not stepping foot in [her] home."

Subsequently on April 30, 2021, the exchange continued with Jonathan still denying he looked at Christina's text messages but acknowledging he "lied the day [he]

6.

took [her] ring." Jonathan told Christina that "Adam" saw her with the person she was dating. Christina replied that she does not "know an Adam." Christina wrote to Jonathan that his "behavior is so bizarre and creepy that it makes [her] not feel safe." She further wrote that she was afraid Jonathan was having someone follow her. Jonathan denied that he was having anyone follow her and wrote that she "won't hear from [him] unless it pertains to [L.]."

In an undated message, Jonathan wrote that he "should not have looked at [her] messages, but [he] didn't need to go through [her] addresses" because Jamie B., the man Christina was dating, was "listed on Google." Jonathan admitted he "was jealous." Jonathan also messaged that he found Jamie's last name because Jamie's number was connected to his business. Christina responded that all she wants from him is to coparent L. and "to stop having conversations about us." In a December 1 message,[5] Jonathan wrote that he has "confessed and apologized for [his] past actions with the ring and [her] phone." In another message, Jonathan apologized for "invading [her] privacy."

In other messages, Jonathan told Christina he loved her and apologized "for everything." A December 18 message from Jonathan states: "Christina, I love you and I'm sorry for everything. You're right. We can't be friends because I don't want to be just friends.… [¶] I understand why you don't want to talk to me about anything."

Christina asked Jonathan to stop texting her in two messages.

### b) **Christina's Testimony**

Christina believed Jonathan was obsessed with her based on "extreme behaviors" including harassment, reading her text messages, conducting an internet search for one of Christina's contacts, and repeatedly questioning who she was with. Christina wondered how Jonathan knew the full name of the person she was dating, Jamie, although it was

---

[5]     Some of the text messages only identify the month and day without the year.

not recorded on her text messages. She did not know how Jonathan knew information about Jamie and it made her afraid.

Christina testified about the incident when she contacted Jonathan from a friend's cell phone while hiking and Jonathan refused to bring L. home because Christina would not disclose who she was hiking with. She said this incident led the parties to update their visitation.

Christina also testified about the incident in her garage when Jonathan returned L. to Christina's house after Christina attended an event. She pointed to Jonathan's text message after this incident saying, "I wish I never saw you in your cowgirl outfit when I approached you in your garage. That still plays with my mind." Jonathan "was going on and on about wanting to do life with [Christina]" that night.

Christina believed Jonathan bought her gifts as manipulation to try to get her to talk with him. Jonathan's text messages referred to a fireplace remote shipping to Christina and flowers Jonathan bought her for Mother's Day. Jonathan also offered to pay for Christina's airfare to Hawaii, but she refused. Although the parties are each supposed to pay half of L.'s daycare tuition, Jonathan had paid for all of it sometimes and given Christina additional money. He was upset when Christina asked him not to and told Christina she can cover his half of daycare.

Christina discussed items that had been taken from her house including her wedding ring, snow boots, hat, custody papers, her personal journal, and the fireplace remote. Jonathan had returned the ring, boots, and hat, but Christina later discovered those items were missing again. Christina believed Jonathan took these items because she does not "think a single person in the world would care about these sentimental items except him."

This behavior has "caused a great deal of anxiety" in Christina's household and worried her older children. Christina wondered if someone was watching or following her because of Jonathan's history of paranoia and researching people she is dating.

### c) Jonathan's Testimony

Jonathan provided a brief history of the former couple's relationship. Jonathan and Christina met around Halloween in 2018 and were married by January 2019. Jonathan witnessed some "very strange behavior" by Christina. Christina would frequently ask Jonathan to leave and have doubts about their relationship. She told Jonathan, "I think I can get this reversed." Christina would wake up in the night and tell Jonathan, "you don't want me, you don't love me, just leave."

On March 20, 2019, Jonathan and Christina were at a gas station. Jonathan was pumping gas when Christina got out of the car and left the station. Jonathan spent the whole night looking for her. He went back to their house periodically to see if Christina was there, but she was not there. Jonathan tried to call Christina's cell phone, but the phone rang in the house. This put Jonathan into more of a panic. Christina eventually walked back to the house and Jonathan found her there. She accused Jonathan of seeing her on the side of the road and passing her, but Jonathan denied seeing her. Christina called Jonathan's mother to tell her that Jonathan left Christina on the side of the road. Christina threw a dish in Jonathan's direction and spit on him. Jonathan decided to move out following this incident.

This was the beginning of a "very volatile period" for the couple. They tried to work on their relationship including through counseling. Around this time, Christina became pregnant with L. Christina sent a text message to Jonathan's mother of a positive pregnancy test. Jonathan questioned if the pregnancy was real or if Christina was trying to lure him back into the relationship. He decided not to move back in with Christina and took a job in Idaho.

Jonathan was unable to return for L.'s birth, but he has been with L. nearly every month since his birth. He would like to be in L.'s life more. Jonathan testified that the text messages submitted by Christina are "little pieces of a much bigger picture." He said there have been "lots of conversation" via voice phone calls and in person meetings that

"go beyond" the snippets shown in the text messages.  Jonathan conceded he wrote the text messages but alleged that Christina was pursuing him too.

Jonathan noted he had apologized and taken ownership for what he had done but further noted that Christina had "done some bad stuff."  He admitted he took Christina's wedding ring, as well as the boots and hat that were part of their wedding.  Jonathan thought if Christina did not want to get back together, she probably did not need those things, but later returned them because they are her property.

About the incident when Christina was hiking, Jonathan testified Christina was supposed to call him at a specific time and when she did not, he took L. to his parents' house for bedtime.  Jonathan texted Christina that she could pick L. up at his parents' house.  He denied he was keeping L. away from Christina, but rather was looking out for L.'s wellbeing because L. was tired and needed to go to bed.

Jonathan found it "interesting" that one police report showed Christina did not want the police to contact Jonathan about the alleged stolen items but instead wanted documentation of the incident to request the restraining order.  Jonathan denied stealing the items Christina had reported missing.

Jonathan then discussed the March 25, 2022 incident when Christina and Jonathan met to exchange L. at the coffee shop.  Jonathan believed Christina violated the custody order and kidnapped L. by leaving with L. after forcefully removing him from Jonathan's car.  Jonathan argued this behavior questions Christina's mental wellness and ability to parent L.

### d) Continuance

Due to time constraints, the trial court ordered a continuance to another hearing.  When Christina asked if the court has "enough information to issue a temporary restraining order," the court replied, "I do not."

The trial court asked the parties if they would like to communicate through the Talking Parents or Our Family Wizard applications.  The court was "not going to make it

10.

an order, but if the parties want to agree to do that, then [the court is] willing to provide [the parties] with the information and give [the parties] some time limits in enrolling." Christina and Jonathan confirmed they would like to enroll. Christina was to select the application and notify Jonathan within five days. The court stated this was how the parties were to communicate "going forward."

The trial court's minute order states "[p]arties are in agreement with using a approved chat application. [¶] The parents shall enroll in a court approved chat application .…" The order further states that "[f]ailure to participate in this program may be taken into consideration by the Court in future custody and visitation matters in this case."

### 3. The June 30, 2022 Hearing

At the third hearing, both parties confirmed to the trial court they had no additional testimony or exhibits to offer. In her closing argument, Christina asked the court to issue a restraining order because her past encounters with Jonathan made her feel unsafe especially with items missing from her house. Christina also reported that Jonathan attempted to call her twice on her personal number on June 22. She believed Jonathan was obsessed with her and was afraid there was surveillance at her house.

In response, Jonathan stated that he did not feel there was any substantial evidence he had been harassing or threatening. He reported that he called Christina twice because he received a [retail warehouse store] rebate check for her in the mail and wanted to let Christina know he was sending it back.

Christina responded that although she cannot prove Jonathan broke into her house, she can prove he had done it before based on Jonathan's text messages apologizing for taking items. She further stated the text messages proved Jonathan was harassing her and obsessed with her. Christina did not think it is "ever okay for [Jonathan] to call [her] at this point." She argued Jonathan could have messaged her about the rebate check through the Talking Parents application and did not need to call her.

11.

After arguments were completed, the trial court took the matter under submission. The court explained its reasoning for ordering the DVRO:

> "The Court is very concerned, and it does seem to be consistent with [Christina]'s argument, that [Jonathan] is currently still obsessed with her. When she specifically asked that he not contact her, and the Court ordered that any contact between the parties would be through the Talking Parents application, that [Jonathan] still felt it was important that he contact her about a check that she received from [a warehouse retail store], and call her directly for that purpose. That concerns me, that behavior. But that is consistent with all the behavior that has been concerning [Christina] for a significant period of time. [¶] She has met her burden of showing that you have disturbed her peace, [Jonathan], and in that—and in that sense, the Court is going to issue the restraining order."

Jonathan timely appealed the DVRO.

## DISCUSSION

### I. Governing Law and Standard of Review

Under the DVPA "a court may issue a protective order ' "to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved" upon "reasonable proof of a past act or acts of abuse." ' " (*In re Marriage of Davila and Mejia* (2018) 29 Cal.App.5th 220, 225.)

As relevant herein, the DVPA defines "domestic violence" as abuse perpetrated against a spouse or former spouse. (§ 6211, subd. (a).) Abuse "is not limited to the actual infliction of physical injury or assault" and includes engaging in "any behavior that has been or could be enjoined pursuant to Section 6320." (§ 6203, subds. (a)(4), (b); *In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416, 1425 ["the DVPA's definition of abuse 'is not confined to physical abuse but specifies a multitude of behaviors which does not involve any physical injury or assaultive acts' "].) Under section 6320, the court may enjoin a party "from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, … harassing, telephoning, … destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming

12.

within a specified distance of, or disturbing the peace of the other party." (§ 6320, subd. (a).)

Prior to 2021, the phrase "disturbing the peace of the other party" in section 6320 was not defined by the statute. (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1497 (*Nadkarni*).) The phrase was "understood as conduct that destroys the mental or emotional calm of the other party." (*Ibid.*; accord, *Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1146 (*Burquet*).) Effective January 1, 2021, the Legislature codified this understanding by amending section 6320 to state: " 'disturbing the peace of the other party' refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party. This conduct may be committed directly or indirectly, including through the use of a third party, and by any method or through any means including, but not limited to, telephone, online accounts, text messages, internet-connected devices, or other electronic technologies. This conduct includes, but is not limited to, coercive control, which is a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty." (§ 6320, subd. (c).) Section 6320, subdivision (c) provides a nonexhaustive list of examples of coercive control including as relevant herein "[c]ontrolling, regulating, or monitoring the other party's movements, communications, daily behavior, finances, economic resources, or access to services." (§ 6320, subd. (c)(3).)

"The DVPA requires a showing of past abuse by a preponderance of the evidence." (*In re Marriage of Davila and Mejia*, *supra*, 29 Cal.App.5th at p. 226.) The Legislature intended the DVPA "be broadly construed in order to accomplish the purpose of the DVPA." (*Nadkarni*, *supra*, 173 Cal.App.4th at p. 1498.) The DVPA " 'confer[s] a discretion designed to be exercised liberally, at least more liberally than a trial court's discretion to restrain civil harassment generally.' " (*Curcio v. Pels* (2020) 47 Cal.App.5th 1, 11 (*Curcio*).)

We review the trial court's grant of a DVRO for abuse of discretion. (*Curcio*,

13.

*supra*, 47 Cal.App.5th at p. 12.) "[T]o the extent we are called upon to review the court's factual findings, we apply the substantial evidence standard of review. [Citation.] In reviewing the evidence, we examine the entire record to determine whether there is any substantial evidence—contradicted or uncontradicted—to support the trial court's findings. [Citation.] We must accept as true all evidence supporting the trial court's findings, resolving every conflict in favor of the judgment. [Citation.] We do not determine credibility or reweigh the evidence. [Citation.] If substantial evidence supports the judgment, reversal is not warranted even if facts exist that would support a contrary finding." (*Ibid.*)

## II. Sufficiency of the Evidence to Support the DVRO

Jonathan argues his June 2022 phone calls to Christina regarding the rebate check were "innocuous" and should not have resulted in the DVRO after the trial court previously declined to issue a temporary restraining order at the end of the May 5, 2022 hearing. Specifically, Jonathan argues this one incident was insufficient to destroy Christina's mental or emotional calm where the court deemed the prior conduct insufficient. Jonathan contends this is not the type of conduct that has generally led to issuance of a DVRO.

Jonathan cites several cases to argue his June 2022 phone calls were insufficient to constitute abuse. (*Nadkarni*, *supra*, 173 Cal.App.4th at pp. 1498–1499 [husband's public disclosure of wife's private emails destroyed her mental or emotional calm by causing " 'shock,' " " 'embarrassment' " and fear]; *In re Marriage of Evilsizor & Sweeney*, *supra*, 237 Cal.App.4th at pp. 1424–1426 [husband surreptitiously downloaded wife's text messages and attached messages to public filings with threats of further disclosures]; *Burquet*, *supra*, 223 Cal.App.4th at pp. 1142–1143 [ex-boyfriend made repeated unwanted phone calls, texts and emails, and arrived unannounced at ex-girlfriend's house]; *Rodriguez v. Menjivar* (2015) 243 Cal.App.4th 816, 819–822 [acts of isolation,

14.

control and threats destroyed protected party's mental or emotional calm].) These cases all involved abuse based on disturbing the peace of the other party under the DVPA.

Jonathan argues the abuse in these four cases differs from his communication to Christina about the rebate check. He suggests there is a threshold of severity of abuse that his conduct does not meet and thus, his conduct cannot constitute abuse as a matter of law. We acknowledge that not every act that "upsets the petitioning party" may be deemed destructive of the party's mental or emotional calm to warrant issuance of a DVRO. (*Curcio*, *supra*, 47 Cal.App.5th at p. 13.) "The DVPA was not enacted to address all disputes between former couples, or to create an alternative forum for resolution of every dispute between such individuals." (*Ibid*.) However, "[w]hat disturbs the peace of a person differs in each case." (*K.L. v. R.H.* (2021) 70 Cal.App.5th 965, 981.) In each of the four cases relied on by Jonathan, the courts' focus was properly on the substantiality of the evidence the party destroyed the mental or emotional calm of the petitioning party, not on the severity of the abuse. The question is thus whether substantial evidence supports the trial court's finding that Jonathan abused Christina by disturbing her peace, not whether Jonathan's behavior meets a purported threshold of severity.

Jonathan attempts to treat his June 2022 phone calls to Christina as a standalone incident that was insufficient to have destroyed Christina's mental or emotional calm as a matter of law. Jonathan compares these calls to cases where a single incident was deemed insufficient to have destroyed the other party's mental or emotional calm. (*Curcio*, *supra*, 47 Cal.App.5th at pp. 12–13 [ex-boyfriend's single, private social media post accusing his ex-girlfriend of abuse was insufficient to support a DVRO]; *S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, 1265–1266 [S.M.'s badgering of E.P. on one occasion was insufficient by itself to constitute abuse.].)

If considered in isolation, Jonathan's two June 2022 calls are insufficient to constitute abuse. (See, e.g., *K.L. v. R.H.*, *supra*, 70 Cal.App.5th at p. 981 [calling other

15.

party a " 'd[**]k' " and failing to show up for custody exchanges was insufficient to disturb a party's peace].) Yet, determining whether a party disturbed the peace of the other party is "based on the *totality of the circumstances*." (§ 6320, subd. (c), italics added; *Hatley v. Southard* (2023) 94 Cal.App.5th 579, 592–593 ["[d]isturbing the peace of another person requires an analysis of the totality of the circumstances"].) Unlike in *Curcio* and *S.M. v. E.P.*, this case does not involve an isolated incident and we do not consider Jonathan's June 2022 calls in isolation, but rather must analyze whether the totality of the circumstances show Jonathan disturbed Christina's peace. (*McCord v. Smith* (2020) 51 Cal.App.5th 358, 366 ["Whether one single act by [the restrained party] would have been sufficient to justify the issuance of the DVRO is not the question—the trial court considers whether the totality of the circumstances supports the issuance of the DVRO."].) We conclude it does.

The evidence demonstrates an ongoing course of harassing behavior by Jonathan toward Christina prior to those calls. While the parties disputed some facts, Jonathan admitted he previously stole personal items from Christina including her wedding ring, snow boots, and hat. Jonathan also confessed to invading Christina's privacy by reading her text messages. (See § 6320, subd. (c)(3) [coercive control includes monitoring the other party's communications].) He searched for information about Jamie, a person Christina was dating, and discovered Jamie's last name and business on the internet. When Christina called Jonathan from Trina's cell phone during her hike, Jonathan frantically questioned Christina about who she was with. He sent text messages to Christina saying he loved her and containing sexual innuendos. During one exchange of L. in Christina's garage, Jonathan pleaded with Christina to be with him and refused her requests to leave for 15 minutes. During another exchange of L., Jonathan entered Christina's house uninvited and stayed for 10 minutes although Christina had previously told Jonathan he is not allowed to enter her house. (See, e.g., *Burquet*, *supra*, 223 Cal.App.4th at pp. 1142–1143.) Jonathan's behavior made Christina afraid he was

16.

watching her or had surveillance to monitor her. She reprogrammed her garage door and changed her door locks. Christina also installed cameras at her house. Viewing the evidence in the light most favorable to the judgment, there is substantial evidence to support the finding that Jonathan disturbed Christina's peace by destroying her mental or emotional calm. The trial court therefore did not abuse its discretion by issuing the DVRO.

## III.     Standard Applied by the Trial Court

Jonathan argues his limited communication to Christina about the rebate check is insufficient as a matter of law for the trial court to conclude he is still obsessed with Christina. He contends the court applied the incorrect standard in determining whether Jonathan disturbed Christina's peace because these two calls swayed the court to issue the DVRO after the court had previously said there was not enough evidence for a temporary restraining order.

" 'Judicial discretion to grant or deny an application for a protective order is not unfettered. The scope of discretion always resides in the particular law being applied by the court, i.e., in the " 'legal principles governing the subject of [the] action ….' " ' [Citation.] Thus, 'we consider whether the trial court's exercise of discretion is consistent with the statute's intended purpose.' " (*In re Marriage of F.M. and M.M.* (2021) 65 Cal.App.5th 106, 116.) " 'If the court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, the court has not properly exercised its discretion under the law. [Citation.] Therefore, a discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal. [Citation.]' [Citation.] The question of whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law [citation] requiring de novo review." (*Eneaji v. Ubboe* (2014) 229 Cal.App.4th 1457, 1463.)

Jonathan suggests the trial court issued the DVRO solely based on his two calls to Christina in June 2022.  This is unsupported by the record.  The court expressed concern that Jonathan called Christina directly after the parties had agreed to use the Talking Parents application but went on to state "that is consistent with all the behavior that has been concerning [Christina] for a significant period of time."  This reflects the court's proper consideration of the totality of the circumstances in reaching its decision, not an improper focus on a single incident.  (See, e.g., *Vinson v. Kinsey* (2023) 93 Cal.App.5th 1166, 1177–1178 [trial court improperly focused on a single incident without consideration of other evidence of abuse in denying the DVRO request].)

Jonathan argues this one incident swayed the trial court to issue the DVRO because the court had previously stated there was insufficient evidence to issue a temporary restraining order at the end of the May 5, 2022 hearing.  The court was unable to complete the previous hearing due to time constraints.  At that point, it was unclear if the parties had finished providing evidence because Christina was equivocal on whether she wanted to provide rebuttal testimony in response to Jonathan's testimony.  At the subsequent June 30, 2022 hearing, both parties confirmed they had no further evidence to offer and rested.  During the parties' closing arguments, Jonathan's two phone calls in June 2022 were discussed.  Jonathan explained that Christina's name is still on his warehouse retail store account and her rebate check was sent to Jonathan's house.  He "just happened to call her to let her know that [he] was sending it back."  Christina questioned why Jonathan could not have sent her a message through the Talking Parents application about the rebate check and argued "he's unable to stop" contacting her.

Preliminarily, we note that the trial court's indication at the conclusion of the May 5, 2022 hearing was not a final order regarding Christina's DVRO request.  "[A] trial court's tentative ruling is not binding on the court; the court's final order supersedes the tentative ruling."  (*Silverado Modjeska Recreation & Park Dist. v. County of Orange* (2011) 197 Cal.App.4th 282, 300; see also Cal. Rules of Court, rule 3.1590.)  A court's

oral or tentative ruling is not " 'necessarily the unequivocal decision of the court. A court may change its ruling until such time as the ruling is reduced to writing and becomes the [final] order of the court.' " (*Silverado Modjeska Recreation & Park Dist.*, at p. 300.) The court was thus free to change its tentative ruling completely before issuing a final decision.

Despite the parties' agreement at the May 5, 2022 hearing to use an application to communicate, Jonathan directly called Christina's personal number twice in June 2022. These calls appear innocuous when considered in isolation. As previously discussed, the record shows the trial court did not consider the calls in a vacuum, but instead, considered the calls as part of a consistent pattern of harassing behavior. The court's reasoning reflects that the calls alone were not dispositive, but instead the calls coupled with Jonathan's prior conduct, were the proverbial straw that broke the camel's back. There was no valid reason for Jonathan to contact Christina *directly* after the parties' agreement to communicate through the application. While the court had previously indicated there was not enough evidence for a temporary restraining order, Jonathan's direct calls after that hearing gave further credence to Christina's argument that he is "unable to stop" contacting her. The record reflects the court correctly considered the totality of the circumstances, including Jonathan's past conduct and the June 2022 calls, in reaching its final decision that Jonathan had engaged in a pattern of abusive behavior that disturbed Christina's peace. Accordingly, we reject Jonathan's argument that the court applied an incorrect standard or abused its discretion in issuing the DVRO.

## DISPOSITION

The order is affirmed. Respondent to recover her costs on appeal.