Filed 12/2/20  Yurasek v. Kesala CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| JASON YURASEK,<br><br>Petitioner, Appellant and Cross-Respondent,<br><br>v.<br><br>BOHDANNA KESALA,<br><br>Respondent, Respondent and Cross-Appellant. | A158859<br><br>(San Francisco County Super. Ct. No. FDI-12-778342) |

Jason Yurasek, as guardian ad litem for his three sons, sought a domestic violence restraining order (DVRO) against his ex-wife Bohdanna Kesala.  Following seven days of trial, the court entered a DVRO, and Kesala appeals, contending that the DVRO cannot stand for four separate reasons: (1) the trial court erroneously applied the law, and the DVRO is (2) not supported by substantial evidence, (3) violates due process, and (4) is overbroad.  Kesala also asserts error in the exclusion of one item of evidence. We conclude none of Kesala's arguments has merit, and thus affirm the DVRO.

In the course of trial, Kesala filed a request for attorney fees, seeking $150,000.  The trial court awarded her $80,000, the amount involved to contest the change in custody dispute between the parties.  Yurasek appeals

that order, contending it is not supported by the Family Code and is against public policy. We disagree, and thus affirm that order as well.

## BACKGROUND

### The General Setting

Yurasek and Kesala were married in 1994 and divorced in 2012. They have three boys, S. (born in 2004), O. (born in 2007), and L. (born in 2008). All three children testified at the 2019 trial, at which time they were 14, 12, and 10, giving testimony, we note, that the trial court expressly found to be "credible."

Yurasek and Kesala are both well educated professionals. Yurasek is the general counsel at a social media company. And Kesala has Bachelor of Science and Master of Fine Arts degrees, and currently earns a significant salary running the global licensing program at a university.

Yurasek and Kesala separated in 2012, and in November of that year Yurasek filed a petition for dissolution. Working with Deepa Pulipati of the San Francisco Family Court Services, Yurasek and Kesala resolved the custody issue through mediation. And in 2014, the court entered a final judgment of dissolution providing for support and shared custody of the minor children—shared custody that remained the status until the 2019 trial here.

According to the register of actions, there were no further contested proceedings relating to the dissolution of the marriage until 2017.[1] But while there apparently were no issues necessitating court involvement, there were issues in the relationship, issues caused by various incidents where Kesala engaged in physical contact with the children. For example, in July 2014,

---

[1] In 2016 the trial court entered a stipulation and order modifying child support.

2

Kesala grabbed S. by the shirt and twisted it, leaving an abrasive burn on his neck and shoulder, and in March 2018, she grabbed S. around the upper neck, leaving visible marks on his face. As to O., one time Kesala slammed his finger in a shower door, causing his nail to fall off; another time, she hit him in the back, leaving what was described as a "five star" mark. As 14-year-old S. described the incidents, there were "just random times when she's mad or she can't handle herself," and "[y]ou never know when that's going to happen." Or as 12-year-old O. put it, "my mom can get really mad really easily," and "she starts arguments very quickly."

In an incident Yurasek describes as "particularly troubling," on an outing to buy a Christmas tree, Kesala left the boys unattended in a running car in the middle of a busy intersection to confront "four or five adult males wearing football jerseys and carrying dixie cups of beer" whom she felt were obstructing the intersection. Another driver stopped to intervene, and the men went away, but not before throwing a cup of beer that hit Kesala and one of the boys. When Yurasek learned of the incident, he told Kesala "you need to call the police"; she responded, "I can't call the police because if I call the police they will arrest me because I punched him first."

Incidents with the children caused Yurasek concern over Kesala's self-control and the well-being of the children. Yurasek attempted to address the concerns with her, but her fundamental response was to deny she had engaged in any abusive conduct with the children, and to cast blame on others, including Yurasek or the children. As Yurasek would put it at trial, "Whenever confronted with anything, she would always say it didn't happen. I didn't do it."

Yurasek contacted Ms. Pulipati, the Family Court Services mediator who, as noted, had negotiated the custody aspect of the dissolution. She was

3

unable to assist, and told Yurasek he would need "to get a private person," that there was no "open matter" at the court.

In October 2016, following an incident where Kesala had hit L. with a shoe, Yurasek was referred to Dr. Charles Brinamen, a family psychologist. Dr. Brinamen began working with the family, including regularly meeting with Yurasek and Kesala, in the course of which he counseled the parents against being physical with the children.

In March 2018, after the incident in which Kesala grabbed S. by the neck, Yurasek went to Dr. Brinamen to, in Yurasek's words, figure out "how are we going to stop this from happening again, and how can we make sure the kids have the ability to leave if their mom is losing it." Kesala promised Dr. Brinamen that she would call Yurasek "when she was feeling overwhelmed," and that the children could call Yurasek if "they were uncomfortable at their Mom's" and the children could go to his house earlier than planned. And Yurasek agreed that if he were called on to take custody of the children from Kesala in these situations, he would not "use it against her."

Then came March 27, 2019.

**The March 27, 2019 Incident**

On the afternoon of March 27, a Wednesday, the boys were at Kesala's house after school. Kesala went upstairs to her bedroom with the door closed to work, leaving the boys downstairs. L. and S. began arguing about a piece of cake and L. told S. he was going to go to his room. They both ran upstairs and shortly thereafter came back down, with S. sitting at the dining room table. L. pushed S., and S. may have tickled L.

As O. described it, Kesala "got really mad" and "stumbled downstairs" and approached S. without pausing to give the boys the opportunity to speak.

4

She "like skip hops or leaps" at S., and grabs his face "really, really hard . . . with both of her hands" and pushes him "back . . . towards the corner of the room" about 10 feet away, holding his "face the entire time," yelling "why do you have to hit your brothers?"  S. was scared, thinking, "I want to get the hell out of here," and protested, "mom, I didn't do anything."  Kesala grabbed S.'s phone and "slammed it" on the dining room table, "started screaming at S. more," "shoved his face into the chair," and hit him with her fist, saying "this is what you do to your brothers.  This is what you do, you hit them." She yelled in S.'s ear "as close as possible," causing S. to fall off the chair onto the floor and, while still grabbing his face, telling him, "you're not feeling pain.  This is not pain."

Kesala then grabbed S.'s arm and yanked him off the floor, yelling "why aren't you looking at me, I'm your mother."  She then grabbed S. by the face again, scratching his chin, and pulled him to the stairs.  S. went to his room and started crying, and Kesala "busted open" the door and began screaming about how S. was "disrespecting" her.

When Kesala had first come downstairs, O. and L. were together in the living room.  O. saw that Kesala was "really mad," and told L. "get upstairs now," which he did.  O. then sent this text message to Yurasek:

"Dad mom is abusing S.  She started choking him and slapping him soo hard I was crying just staring at it.  Mom kept in slapping so so so hard she was beating him like he was a punching bag she's crazy.

"Starring.

"[S.]'s tromatized.  [*Sic.*]

"I'm scared.

"See you at the spring concert."

5

Yurasek, who was having a late lunch with a friend, called O. O. answered, and in a whisper told Yurasek he was hiding under the dining room table, and then cut the call short because he did not want Kesala to hear.

Yurasek attempted to call Dr. Brinamen, who was unavailable, and then sent him a text message describing his call with O., summing up: "we are in another example of what do I do[?]" Dr. Brinamen did not immediately respond, and Yurasek called the police to ask them to check on the children.

Officer Steve Colgan of the San Francisco Police Department went to Kesala's house and asked to speak with the children alone. Kesala would not let him, and he left, but remained outside with other officers.

While Officer Colgan was outside, Kesala told the children, "oh my God. Guys, why? Like why? This is all your fault. This is all your fault." She demanded to see the text O. had sent Yurasek, and then "got, like really mad," and said, "you guys are just like, horrible." She then told S. "I'm going to get in serious trouble for this," and, S. said, he "was scared that she was going to jail."

Yurasek had forwarded O.'s text to Officer Colgan, who determined that despite Kesala's resistance he needed to talk to the children alone. He reentered the house, first interviewing Kesala and then each of the children. As all three would later describe it, they were afraid Kesala might get in trouble and in the interviews downplayed their mother's conduct.[2] Despite

---

[2] S. testified he "told the story, but in a very—I was really scared, and I told, like, a—story not as, like what it is. I told it a little less intense. Asked what he was scared of, S. said, "my mom was going to jail."

O. testified, "So I didn't want, like, my mom to get in trouble. So I didn't really, like, say a lot what happened."

the children's interviews, Officer Colgan reported the incident to Child Protective Services, believing he had an obligation to do so.

Kesala spoke with Dr. Brinamen by phone on the day of the incident, admitting she had grabbed S. by the face, hit him in the arm, and pushed him into a chair. She acknowledged that her conduct was "unacceptable" and that "things had gotten out of hand."

Dr. Brinamen asked Kesala and Yurasek to meet with him the next day. Yurasek agreed and Kesala initially did too. She later changed her mind and refused to meet, sending this email to Dr. Brinamen: "I'm not coming in to talk to Jason. It's time that he stop himself from escalating and realize his behavior is detrimental to the boys because if he keeps doing this, the boys will not forgive him. They are already very upset with him and see him as the cause of this entire situation." Kesala met with Dr. Brinamen two days later, who told her that the incident "was real problematic" and that even her own version of the story "was not ideal. And it wasn't good for her or S." Kesala responded by nodding her head and becoming teary-eyed.[3]

**The Proceedings Below**

---

L. testified, "I told the story in a less—in, like, a lower exaggerated way of like how it actually happened. Because I thought when the police officers came that maybe, like, I would—it would affect my mom if I said something too bad."

[3] At trial Kesala would give an account of the incident in which she was not responsible. She essentially accused S. of giving perjured testimony. And she denied that she grabbed him by the face ("I just forcefully, but gently held his face"), and denied she pushed him, slammed his phone on the table, hit him, yelled at him, or that he was ever on the ground. In her mind, S. "wasn't scared as hell. He was being obstinate," claiming that S. deserved the treatment because he had a "smug look on his face." She also blamed Yurasek, testifying that he had "gone way too far" by calling the police in response to the text from O.

7

On April 5, 2019, Yurasek, on behalf of the three minor children, filed a request for a DVRO based on the March 27 incident, stating that the application was sought "only reluctantly and only after our efforts to address the health and safety of our children were unsuccessful." The court appointed Yurasek as guardian ad litem and issued a temporary restraining order (TRO) the same day, which TRO provided that Yurasek would have temporary legal and physical custody of the children, who would have supervised visitation with Kesala one day every weekend from 11:00 a.m. to 6:00 p.m.

Two weeks after the TRO issued, Yurasek requested the court appoint a child custody evaluator as a court-appointed expert under Evidence Code section 700 and California Rules of Court, rule 5.250, and place the trial on the long-cause calendar. Kesala filed opposition and requested that the court "change the visitation orders that are attached to th[e] TRO." The matter came on for hearing, during which Kesala's counsel made an oral motion to remove Yurasek as guardian ad litem, on which the court ordered briefing.[4] The court did not address Yurasek's request for a custody evaluator as a court-appointed expert, but did modify the TRO by adding three hours to Kesala's supervised visitations on Saturdays.

Trial took place over seven days from May 21 to July 25. Yurasek, Kesala, Officer Colgan, and Dr. Brinamen testified in open court with traditional direct and cross-examination. The three children testified in the court mediator's office, without counsel present, accompanied by Donna

_____

[4] On the first day of trial, Kesala withdrew her objection to Yurasek's appointment as guardian ad litem.

8

Guillory, the Family Court Services Supervisor, who questioned the children, as did the court.

On the last day of trial, Kesala sought to introduce a 26-minute videotape from the body camera worn by Officer Colgan, who had testified on the second day of trial. The trial court excluded the video as cumulative.

On July 25, the court heard closing argument and, following a brief recess, announced its extensive findings and orders. Among other things, the court found that Kesala had committed domestic violence and issued a one-year restraining order for the protection of the three minor children. The court specifically found each of the children's testimony to be "credible," and specifically rejected Kesala's contention that their testimony was "coached or somehow influenced by their father, Mr. Yurasek." And the court expressly rejected Kesala's argument that her conduct was nothing more than "the exercise of a parent's authority to guide and discipline" children. The court ordered Kesala to continue with individual therapy, and granted temporary sole legal and physical custody to Yurasek, maintaining the visitation schedule set by the TRO. The court also ordered a "tier 2 interview for Family Court Services mediator to interview" the children, and a custody evaluation.

On August 20, the court entered its DV-130 restraining order after hearing, from which Kesala filed her notice of appeal.

**The Attorney Fees Request**

On June 24, the fourth day of trial, Kesala filed an ex parte application seeking among other things modification of the TRO and an "order for attorneys' fees of $150,000 and costs of $20,000 pursuant to Family Code section 2030." Yurasek objected, and the court did not immediately rule on Kesala's ex parte application, stating essentially that the request should be

9

made in the law and motion department.  However, and as will be discussed in detail below, at the conclusion of trial the court announced it would deny Kesala "fees and costs related to the DVRO proceedings," but that it was "going to order attorneys' fees for the purpose of proceeding with the child custody proceedings under section 2030."  The court directed Kesala's counsel to "break out the attorneys' fees request and indicate what is needed on the child custody portion of the case, and separate it out from the fees incurred on the DVRO proceedings."

Following further briefing, by order of September 5 the court awarded Kesala $80,000 in attorney fees and costs.  Yurasek paid those fees under protest and filed an appeal.

## DISCUSSION

### Summary of Kesala's Argument

Kesala's brief sums up her appeal on page 13, that she appeals "on the following grounds":

"Kesala's exercise of her fundamental right to engage in reasonable parental discipline constituted a complete defense.

"The trial court's application of law was erroneous;

"The orders were not supported by substantial evidence;

"The erroneous exclusion of video evidence was prejudicial;

"The trial court violated Kesala's procedural due process rights; and

"The protective order is overbroad."

Page 41 of the brief elaborates on this, in the "Summary of Argument": "The finding of disturbing the peace is not supported by substantial evidence of mens rea, thereby creating a strict liability offense.  Kesala engaged in reasonable parental discipline, thereby affording her a complete defense. Reasonable parental discipline is a fundamental right that cannot be

10

enjoined.  There was no substantial evidence the boys' mental or emotional calm was destroyed or of causation.  The trial court erroneously excluded the police video tending to disprove the boys' peace was disturbed and which was the best evidence of their mental state resulting from the incident.  The trial court violated Kesala's due process rights by finding against her on an issue not advance[d] at trial.  The protective order is overbroad because it prohibits lawful behavior and includes O. who was not afraid of Kesala."

Kesala is wrong on all counts.

## The Trial Court Properly Applied the Law in Finding Abuse

### *The Statutory Scheme and the Standard of Review*

California law has a comprehensive statutory scheme aimed at the prevention of domestic violence:  the Domestic Violence Protection Act (DVPA) found at Family Code sections 6200 et seq.[5]  Section 6220 sets forth the purpose of the DVPA:  (1) to prevent the recurrence of acts of domestic violence and (2) to provide for a separation of those involved in order to resolve the underlying causes of the violence.

Our colleagues in Division One distilled the applicable law in *In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416, 1424 (*Evilsizor*):  "A court may issue an order enjoining specific acts of 'abuse' (§ 6218, subd. (a)), which are defined as, among other things, behavior that could be enjoined under section 6320.  [Citation.]  Section 6320, in turn, permits a court to enjoin a party from engaging in various types of behavior, including 'disturbing the peace of the other party.'  (§ 6320, subd. (a).)  '[T]he plain meaning of the phrase "disturbing the peace of the other party" in section 6320 may be properly understood as conduct that destroys the mental

_____

[5] Statutory references are to the Family Code unless otherwise indicated.

11

or emotional calm of the other party.' (*In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1497 (*Nadkarni*).)"

In short, "abuse" is "not limited to the infliction of physical injury or assault," but also includes "mental or emotional" harm as well. (*Evilsizor, supra,* 237 Cal.App.4th at p. 1425; see generally Hogoboom & King, Cal. Practice Guide:  Family Law (The Rutter Group 2019) ¶ 5:67b and numerous cases there cited.)  And the phrase "disturbing the peace" must be broadly construed in order to accomplish the purpose of the DVPA.  (*Nadkarni, supra,* 173 Cal.App.4th at pp. 1497–1498.)

We review an order granting a DVRO for abuse of discretion. (*Nadkarni, supra,* 173 Cal.App.4th at p. 1495.)  And as *Evilsizor* also noted: "In considering the evidence supporting such an order, 'the reviewing court must apply the "substantial evidence standard of review," meaning " 'whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted,' supporting the trial court's finding. [Citation.]  'We must accept as true all evidence . . . tending to establish the correctness of the trial court's findings . . . , resolving every conflict in favor of the judgment.' " [Citation.]' (*Burquet v. Brumbaugh* (2014) 223 Cal.App.4th 1140, 1143.)" (*Evilsizor, supra,* 237 Cal.App.4th at p.1424.)

Our review under the abuse of discretion standard is based on well-settled principles, including these from the Supreme Court:  Discretion is "abused" only when, in its exercise, the trial court " 'exceeds the bounds of reason, all of the circumstances before it being considered.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566; see *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 ["A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it' "].)

12

Finally, the trial court's exercise of its discretion is measured against its "consisten[cy] with the statute's intended purpose" (*People v. Rodriguez* (2016) 1 Cal.5th 676, 685), which, as quoted above, are the two express purposes enshrined in the DVPA, both referencing the future. In short, while past acts of abuse "may" form an adequate basis on which to issue a DVRO, the purpose of such an order is still entirely prospective: to "prevent acts of domestic violence [and] abuse" in the future and to "provide for a separation of the persons involved . . . ." (§ 6220.)

Faced with these principles, Kesala has a daunting challenge—a challenge she has not met.

Kesala acknowledges that the "trial court found domestic violence on the lesser nonviolent [*sic*] ground of section 6320's 'disturbing the peace' " and argues that such a finding contains an "implicit" negation of any other form of abuse. This argument turns the standard of appellate review on its head, as we indulge every reasonable inference to support the trial court's order, not to undermine it. More fundamentally, the argument provides no grounds for reversal, since the "disturbing the peace" standard in section 6320 provides ample grounds for the DVRO here. (*Nadkarni*, *supra*, 173 Cal.App.4th at pp. 1497–1498.)

Kesala argues that she lacked the mens rea or "wrongful intent," asserting that the trial court erred because her subjective intent "was to effect reasonable parental discipline, not to disturb the children's peace or to hurt them," and that "the Legislature expressly included a mental state requirement" in the DVPA, in essence requiring proof that she acted with "wrongful intent." And, she claims, the trial court applied the wrong legal standard by creating a "strict liability offense" that dispenses with "a mens rea, scienter, or wrongful intent element."

To begin with, Kesala has cited nothing supporting that section 6320 imposes a "mental state requirement" for all forms of abuse. The purpose of a DVRO is to protect victims of domestic abuse, and "the Legislature intended that the DVPA be broadly construed in order to accomplish [its] purpose." (*Nadkarni, supra*, 173 Cal.App.4th at p. 1498.) We agree with Yurasek that "A child's need for protection is just as great whether the abuser acts from malicious intent, the heat of passion, irresistible impulse, or a misguided sense of parental discipline."

But even if Kesala were correct, that the statute implicitly applies only to abuse committed intentionally, such was present here. Intentionally simply means "[t]o do something purposefully, and not accidentally." (Black's Law Dictionary (6th ed. 1990) p. 810.) Kesala admits she acted with "intent . . . to effect reasonable parental discipline." And the trial court found that Kesala carried out this intent in a manner that constitutes "abuse" under the DVPA.

Kesala argues that she has a "fundamental right" to discipline the children that "is not enjoinable," and that her imposition of discipline cannot constitute "abuse" under the DVPA. This is very wrong, as perhaps best shown by Kesala's acknowledgement in the first paragraph of her brief that "when discipline is excessive, a parent commits domestic violence or child abuse." In any event, the trial court was fully cognizant of "a parent's authority to guide and discipline your children," and found that Kesala had crossed the line into "behavior that is enjoinable under the [DVPA]." And that finding is supported by substantial evidence.

14

**The Trial Court's Finding of Abuse is Supported by Substantial Evidence**

*Introduction*

As will be discussed to some extent below, Kesala's position on appeal is premised on her version of events, essentially disregarding the evidence adverse to her. For example, Kesala's brief references her testimony that "I don't hit my kids in anger" and "I don't punish them with physical punishments for being bad," but omits Dr. Brinamen's testimony that Kesala had admitted to him that she "had hit [S.] in the arm" and "pushed him into a chair," and that she referred to "her own conduct as unacceptable." Kesala states that Officer Colgan "found no abuse," but omits that all three children testified they toned down what they told Officer Colgan. Indeed, Kesala devotes an entire section of her brief—over five pages—challenging "S.'s credibility," asserting that his version of the incident was "suspect" and "was contradicted by Yurasek," all this in the face of the trial court's express finding that S. and his brothers were credible, a finding binding here.[6] (*In re Marriage of Roe* (1993) 18 Cal.App.4th 1483, 1488.)

This is most improper.

California Rules of Court, rule 8.204(a)(2)(C) provides that an appellant's opening brief shall "[p]rovide a summary of the significant facts." And the leading California appellate practice guide instructs about this: "Before addressing the legal issues, your brief should accurately and fairly state the critical facts (including the evidence), free of bias; and likewise as to the applicable law. [¶] Misstatements, misrepresentations and/or material

_____

[6] This is illustrated in Kesala's brief which in its "Statement of Relevant Facts," has headings describing O.'s "false text to Yurasek," S.'s version of the incident was "suspect," and there were "no indications of fear."

omissions of the relevant facts or law can instantly 'undo' an otherwise effective brief, waiving issues and arguments; it will certainly cast doubt on your credibility, may draw sanctions [citation], and may well cause you to lose the case!" (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2010) ¶ 9:27, p. 9-8 (rev. # 1, 2010, italics omitted.) Kesala's brief ignores this instruction.

Kesala's brief also ignores the precept that all evidence must be viewed favorably to Yurasek. (*Nestle v. Santa Monica* (1972) 6 Cal.3d 920, 925–926; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) In sum, what Kesala attempts here is merely to reargue the "facts" as she would have them, an argumentative presentation that violates the rules noted above, a treatment of the record that disregards the most fundamental rules of appellate review. (See 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, §§ 365, 368 421–424, pp. 425–426.) As Justice Mosk well put it, such "factual presentation is but an attempt to reargue on appeal those factual issues decided adversely to it at the trial level, contrary to established precepts of appellate review. As such, it is doomed to fail." (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 398–399.)

There was substantial evidence of abuse, substantial evidence to support the trial court's express finding that Kesala "disturbed the peace" of the children, i.e., destroyed their mental or emotional calm. (*Nadkarni*, *supra*, 173 Cal.App.4th at p. 1497.) All three children testified to their fear of Kesala. And as shown above, Kesala physically and verbally attacked S. in front of O. and L., with O. so scared he told his younger brother to "get upstairs right now." L. did, and shut his bedroom door and sat with his back against it, afraid Kesala was going to attack him like she had S. Meanwhile, O., who had texted his father, said in a phone call that he was under the

16

dining room table, a call he cut short because he was scared his mother would hear. And S. was so afraid after Kesala's attack that he went to his room and cried until the police arrived.

Moreover, Kesala's conduct had repercussions on the children. Fourteen-year-old S. began crying while testifying about the incident, and still did not feel safe visiting Kesala without the nanny present. O.'s best friend noticed a change in O.'s demeanor after the incident. And L. thought about the incident "a lot" and, like S., felt safer at Kesala's house when the nanny was present.

Kesala herself acknowledged to Dr. Brinamen that her conduct during the March 27 incident had been unacceptable, that it was not good for her or S. In her words, for S. "there's always going to be a before and after . . . this incident." Dr. Brinamen agreed, testifying that Kesala's behavior had been "problematic," that she had subjected the children to "a really upsetting incident."

Such evidence is more than sufficient to support a finding that Kesala's conduct destroyed the children's peace and calm. That is disturbing the peace. (See, e.g., *Nadkarni, supra,* 173 Cal.App.4th at p. 1483; *Burquet v. Brumbaugh, supra,* 223 Cal.App.4th at pp. 1146–1147 [legal standard for disturbing the peace under DVPA different from that under Penal Code].)[7]

_____

[7] Kesala did not request a statement of decision. "In the absence of a request for specific findings, a reviewing court must imply in support of the judgment all reasonably necessary factual findings that may be inferred from the findings actually made." (*Union Bank v. Ross* (1976) 54 Cal.App.3d 290, 297.)

In light of this, there is also substantial evidence to support an implied finding that Kesala attacked S. causing bodily injury and causing him to reasonably fear imminent serious harm. (§ 6203, subds. (a)(1), (a)(3).) As the boys testified, Kesala pounced on S. in the dining room, grabbing him by the face "really, really hard" and pushing him down into a chair, and then onto

**The DVRO Did Not Violate Due Process**

Kesala argues that the trial court violated due process because she lacked notice that "the trial court was considering disturbing the peace" as a basis for the DVRO. The essence of the argument is that "disturbing the peace" was not the thrust of the trial and entered the case only in closing argument, when counsel for Yurasek argued it.

By way of brief background, following the argument by Yurasek's counsel, Kesala's counsel had the opportunity to respond. This is what he said about "disturbing the peace":

"MR. O'KEEFE [counsel for Kesala]: So she made an argument that they proved that the kids—you know, that there was a disturbance of the peace. That's not the standard in this case. You know, there's a right to parental discipline and a right to use force. We didn't even get to that level.

"But the standard in this case is defined under Penal Code section 11165.6 which requires intent—the willful intent to harm or injure a child. So it's not disturbing the peace. That's not true.

"She made a lot of references to [O.'s] texts and used that to show [O.] was scared because he said he was scared, but we know [O.] said that text was not true, including the part about him being scared."

That was it. There was no objection to "disturbing the peace."[8]

---

the floor, hitting him multiple times with a closed fist. The attack left S. with scratches and bruises, an attack, it can be inferred, that caused all three boys to fear bodily injury.

[8] Sixteen pages later, after the trial court announced its decision, counsel for Kesala referred again without objection to "the finding here is that it's disturbance of the children's peace and well-being."

18

Then, when the trial court announced its decision, among other things finding Kesala's conduct "enjoinable as disturbing the peace of the children," counsel for Kesala again voiced no objection.

In light of this, the argument Kesala raises here—that disturbing the peace was not involved—was not raised below. It was thus waived or forfeited. (*Amato v. Mercury Casualty Co.* (1993) 18 Cal.App.4th 1784, 1794 ["It must appear from the record that the issue argued on appeal was raised in the trial court. If not, the issue is waived"]; *City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 685 [contentions or theories raised for the first time on appeal are not entitled to consideration].)

In any event, the argument would lose on the merits.

To begin with, Kesala's assertion that she lacked notice about "disturbing the peace" is belied by the record. The mandatory form DV-100 Yurasek filed expressly references the statutory definition of "abuse," which includes disturbing a party's peace. Even more importantly, the form had attached to it Yurasek's declaration setting forth the facts regarding the incident on March 27 and numerous other facts. The declaration was nine pages long, and had 24 paragraphs, which among other things referred to the boys confirming "the physical and emotional abuse inflicted by their mother." Kesala was on notice of what was involved, and it included emotional abuse.

Beyond that, Kesala has not shown the claimed lack of notice was prejudicial such that a more favorable result would have been probable, which is what is required. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475.) While Kesala argues that "she would have approached the case differently," she does not elaborate as to how, nor does she identify any evidence that contradicts or undermines the trial court's findings.

**The DVRO is Not Overbroad**

In a brief 16-line argument, and citing no cases involving the DVPA, Kesala argues that the DVRO is overbroad because it prohibits lawful behavior, specifically, "any behavior that could cause . . . emotional discomfort" or "would cause the children to become anxious or fearful."[9]

Kesala has once again forfeited the issue, as she did not challenge the language below. Indeed, not only did she not object to it, her own form of order agreed with it, which "constitutes a waiver of the issue, since appellant and counsel acquiesced in and contributed to any such error." (*Sperber v. Robinson* (1994) 26 Cal.App.4th 736, 742–743.) In any event, Kesala does not specify what "lawful behavior" is prohibited, that is, what "law" authorizes her to inflict "fear and anxiety" on her children.

Kesala also asserts, however briefly, that the DVRO was overbroad because it "included O., who was not afraid of Kesala." Section 6320 gives the trial court discretion as to whom to include in a protective order. (§ 6320, subd. (a).) And the trial court acted within its discretion by including O., who Kesala had slapped in the past, who had witnessed Kesala's attack on S., and who sent Yurasek a text telling him he was scared. Kesala may assert that O. was "not afraid of Kesala," but O. testified that his mother "was, like hitting [S.], and it was, like, really scary."

---

[9] The excerpted language is found in this paragraph of the DVRO: "The parents will not subject the children to corporal or harsh punishment such as yelling in the children's face; intimidation of any kind; berating comments; threats of self-harm; spanking; hitting or striking with any instrument; hitting with a closed fist; hitting with head or face; choking; kicking; shaking; grabbing a child's face; or any behavior that could cause injury, bruising, or physical or emotional discomfort. Additionally, the parents will not engage in any other type of behavior that would cause the children to become anxious or fearful."

20

**Exclusion of the Body Camera Video Was Not Error**

As noted, on June 10, the second day of trial, Kesala called Officer Colgan out of order,[10] and did not seek to introduce his body camera video during his testimony. On July 25, the last day of trial, Kesala sought to introduce 26 minutes of video footage from the body camera. Doing so, Kesala's counsel conceded the video provided no direct evidence of the truth of any disputed fact, and was offered as circumstantial evidence of the "mental state" of Kesala and the children, going so far as to concede the video "may be duplicative in some respects" of evidence already admitted. The trial court excluded the video, stating "[a]t this point I think it's cumulative."

This, of course, is a discretionary ruling. (*Belfiore-Braman v. Rotenberg* (2018) 25 Cal.App.5th 234, 249–250; Evid. Code, § 352.) And Kesala has shown no abuse, nor that the exclusion of the video resulted "in a miscarriage of justice." (Evid. Code, § 354.)

**Yurasek's Appeal Has No Merit: The Order Awarding Fees Was Not Error[11]**

***Introduction and the Standard of Review***

As noted above, following various post trial proceedings the trial court awarded $80,000 in need-based attorney fees to Kesala under section 2030.[12]

---

[10] Officer Colgan had been subpoenaed and had apparently come to court on two prior occasions.

[11] Months after briefing was completed, counsel for Kesala filed letters with this court, one of which attached a transcript from an August 2020 hearing, the thrust of which was to seek to have Yurasek's appeal dismissed under the disentitlement doctrine. We reject the attempt and address the merits of Yurasek's appeal.

[12] Which provides in relevant part: "In a proceeding for dissolution of marriage, nullity of marriage, or legal separation of the parties, and in any proceeding subsequent to entry of a related judgment, the court shall ensure that each party has access to legal

21

The trial court enjoys broad discretion in awarding attorney fees in marital-based disputes (*In re Marriage of Sullivan* (1984) 37 Cal.3d 762, 768), and its decision whether and in what amount to award such fees is reviewed for abuse of discretion. (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 282–283.)

Yurasek does not challenge the findings that Kesala demonstrated need or that he had the ability to pay, nor does he claim that the amount awarded was unreasonable. Rather, Yurasek's appeal is premised on the arguments that there must be a statutory basis for attorney fees, which the DVPA does not provide; that he brought the request for DVRO as guardian ad litem and was thus not a party against whom fees could be awarded; and that to award fees to one against whom a DVRO was entered is against public policy. Based on that, Yurasek asserts that the standard of review is de novo, relying on this quotation from the Supreme Court in *Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175, quoting *Carver v. Chevron U.S.A., Inc.* (2002) 97 Cal.App.4th 132, 142: " 'On review of an award of attorney fees after trial, the normal standard of review is abuse of discretion. However, de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law.' " So, Yurasek contends, the standard of review is de novo

---

representation, including access early in the proceedings, to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party . . . to pay the other party . . . whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding." (§ 2030, subd. (a)(1).)

22

"because whether fees are available depends on the construction of section 2030 and the DVPA."

We disagree, especially because Yurasek's treatment of the record is less than complete, and indeed suffers from similar infirmities as does Kesala's brief. Put otherwise, Yurasek's brief utterly ignores that custody was involved in the proceeding—put there by Yurasek himself.

As indicated above, Yurasek started the DVRO proceeding with his request on April 5, a request that not only sought temporary custody pending hearing on the DVRO, but affirmatively requested modification of the parties' joint custody order. Specifically, following instructions to "check the orders you want," Yurasek checked the box in item 12 that said: "I have a child custody or visitation order and I want it changed." Yurasek attached form DV-105, "Request for Child Custody and Visitation Orders," identifying himself as "Dad" for purposes of requesting modification of a current custody order, and as such, sought sole legal and physical custody of the boys, stating, "I want to change a current child custody or visitation court order" in case number "FDI-12-778342." On the next page, Yurasek checked the box that represented as a "Party" he was "involved in" the "Other Custody Case," i.e., "FDI-12778342," a case he described as a "Divorce" case in which the trial court issued a custody order dated "9/12/2017." In sum, Yurasek in his individual capacity as "Dad" and a "Party" to the divorce case, initiated a custody modification proceeding by affirmatively seeking modification of the joint custody order.

On June 11, the third day of trial, the trial court granted Yurasek's request for a custody evaluation, with the understanding that it would not be completed in time for use in the trial. This is what the court said: "[L]et me just also provide some feedback about the child custody evaluation that both

23

sides seem to acknowledge is going to happen.  [¶] . . . [¶]  Given how long it takes to select, retain, and then get started with a custody evaluator, I'm going to suggest to both sides, if you agree that there needs to be a custody evaluation, that you start talking now about the selection of that person, how the person is going to be paid, and then start inquiring about availability.  [¶] . . . [¶]  Because I understand that Ms. Kesala's concerned about doing a custody evaluation under the current temporary visitation orders.  But I think the fact of the matter is, by the time your selected evaluator gets started and does home visits, this trial should be long over."  The court went on to describe the DVRO and custody modification proceedings "as two separate issues."

In late June, apparently the 24th, Kesala served her ex parte request for change of custody, attorney fees, and costs under section 2030, and the trial court set hearing on the request for July 25.  At the hearing on June 24, Yurasek's counsel took issue with Kesala's "motion asking for emergency relief and new custody orders," and complained that Kesala did not agree to an evaluator who would not be available for six months.  The trial court again stated its view that custody issues were separate from the DVRO proceeding: "I know that the child custody issues are complex and highly contested, but I would like to deal with the domestic violence issue first."  And the court again indicated its ruling regarding custody evaluation was in anticipation of future events:  "So I am trying to, because we know custody evaluations take time under the best of circumstances, I am trying to get the parties to start working on it now so that it can be completed in as timely a fashion as possible.  [¶] . . . [¶]  I would say six months is probably too long to wait to get started."

24

On July 19, having received no substantive opposition from Yurasek to her request for fees and custody, Kesala submitted a brief in support of her request. Among other things, Kesala argued that a DVRO action is "related" for purposes of awarding fees under section 2030 because "post-dissolution custody modification proceedings [are] 'related' to the dissolution proceeding for purposes of a need-based fee request." Kesala further argued that "although [Yurasek] could have pursued a modification of custody by motion, he chose the heavy-handed tactic of an ex parte restraining order, notwithstanding the contrary reports/advice he received from Officer Colgan and Dr. Brinamen. [Yurasek's] strategy gained him advantage of an immediate change from 50% to full custody without notice and a hearing. Thus, the substance and effect of [Yurasek's] DV[RO] action was the modification of custody." Kesala requested a fee award and reinstatement of her right to joint legal custody.

As noted, the DVRO trial concluded on July 25, and following closing arguments the trial court announced its findings and decision to issue a DVRO against Kesala and related items, going on for over four pages. After all that, the trial court said: "The next major step in your case is to participate in and complete the child custody evaluation. In regards to the scope of the child custody evaluation, Mr. O'Keefe, the scope of evaluation that you proposed is acceptable to the court. And I will add on a question for the evaluator to directly answer whether or not there's any reason to believe there's parental alienation on either side. . . ."

The court then turned to the issue of attorney fees, saying this: "Regarding attorneys' fees, the court is not going to order Mr. Yurasek to pay attorneys' fees to Ms. Kesala for fees and costs related to the DVRO proceedings. . . .

"However, I am going to order attorneys' fees for the purpose of proceeding with the child custody proceedings under section 2030. The court definitely finds that Mr. Yurasek has greater access to funds.

"What I need to know, Mr. O'Keefe, is I need you to break out the attorneys' fees request and indicate what is needed on the child custody portion of the case, and separate it out from the fees incurred on the DVRO proceedings. And the court will make a reasonable grant of attorneys' fees to enable Ms. Kesala to have even footing on the child custody part of the case and move forward with the next set of proceedings, which I know there will be.

"So I'm going to make an order for [section] 2030 attorneys' fees, but I need some information, Mr. O'Keefe, on what the amount incurred was related to custody and visitation— so the child custody evaluation for example—and what the expected need is moving forward."

The trial court set the matter for hearing on September 5.

On August 16, in a further effort to modify the temporary custody order, Yurasek filed an ex parte application seeking an emergency order that Kesala should only be allowed to visit with the boys once per week. On August 20, Yurasek filed another ex parte request to change the temporary custody order. And on August 23, Yurasek filed a belated opposition to the fee request, raising the same arguments the trial court had already considered on July 25. Yurasek also asserted that Kesala pay him prevailing party fees and costs of $389,422, under section 6344.

On August 29, counsel for Kesala filed his apportionment of fees, along with opposition to Yurasek's motion for reconsideration and request for prevailing party fees.

On August 30, Yurasek reiterated his request for modification of the "custody schedule and parenting plan . . . as requested in [his] ex parte request filed on August 20." The August 30 filing not only argued for denial of the fees to Kesala, it also accused Kesala and her counsel in engaging in unethical conduct. And it reiterated Yurasek's claim to attorneys' fees under section 6344.

On September 3, Kesala filed her response to Yurasek's charge of unethical conduct and his request for fees.

Prior to the scheduled September 5 hearing, the court issued a tentative ruling. Yurasek contested it, and a lengthy hearing ensued, which began with the court noting: "I . . . read everything that both sides gave me. . . . About three inches high. . . . And I have reviewed the numerous filings that were given to me by both sides and so I do understand." Then, five pages later, and as relevant here, the court explained its reasoning for awarding fees: "[T]here's been a parallel subaction running alongside the DVRO hearing, which was the child's custody evaluation. . . . I have ruled on the domestic violence restraining order. I have granted the request. I have found that there's been an act of abuse under the DVPA. Now we are moving to the next phase of the case, which is going to be—and I have made temporary custody orders, and now we need to move forward to the custody evaluation and getting back to a more permanent custody arrangement down the road, assuming the presumption against custody is rebutted."

The trial court then noted that "Mr. Yurasek has filed another request for order regarding custody and visitation separate from the DVRO. So procedurally there is a custody issue going on." To which counsel for Yurasek responded, Kesala "may be entitled to fees if there is a motion for a change in custody." Then following brief argument by Kesala's counsel, the court

27

announced it would adopt its "tentative ruling with some modifications," saying this: "In terms of the amount of attorney's fees, the court is going to award [section] 2030 attorney's fees to mother. The $80,000 breakdown for your information was $45,000 in prospective fees, 100 hours, and $40,000 for incurred fees related to the custody evaluation and issues on the 2030 motion as identified in Mr. O'Keefe's invoice. I didn't give the full amount of fees associated with those activities, but I awarded $35,000 related to fees incurred for the custody evaluation and motion issues related to the ex parte request from Mr. Yurasek and the 2030 motion. [¶] . . . [¶]

"I went through the invoice submitted by Mr. O'Keefe and identified . . . I previously ruled that Ms. Kesala is not going to recover fees on a DVRO as she is not the prevailing party. And I went through the invoice by Mr. O'Keefe and identified the fees incurred that were related to the child custody evaluator, the ex parte motion that's on calendar for today, and the 2030 fees request. Okay? So I am going to maintain that amount. [¶] . . . [¶] And just to be clear, the court anticipates that this fee award is going to cover the completion of the next phase of the case on the child custody evaluation."

On that same day, the trial court filed its findings and order after hearing, a comprehensive four-page, single-spaced order reflecting all—and we mean all—that the court had done. It was a model order, ending with this: "Mother's request for attorney's fees and costs for the child custody and visitation issues is GRANTED IN PART. The court finds that the appropriate amount is $35,000 for fees and costs already incurred related to the child custody evaluation and the two motions on calendar today, and $45,000 for anticipated future fees to complete the phase of the case related to the pending child custody evaluation. Father is ordered to pay the total

amount of $80,000 to Mother as and for attorney's fees and costs pursuant to [Family] Code [section] 2030 in two equal payments. . . ."

The ruling by the trial court was spot on, manifesting conduct of the trial court about as far from abuse of discretion as imaginable. But even were our review de novo, the trial court had it right, as the issue of custody was in the case from the beginning, put there by Yurasek's request for DVRO and the boxes he checked and the attachments he filed. As the trial court properly held, the DVRO and the custody dispute were "two separate proceedings," with the understanding that the latter would not be completed before the end of the DVRO trial. Were all that not enough, as Yurasek's own counsel acknowledged at the September 5 hearing, "if there is a motion for change in custody," Kesala "may be entitled" to attorney fees. Indeed. There was no error.

## DISPOSITION

The DVRO and the order of September 5, 2019 are affirmed. Each side will bear its respective costs on appeal.

_____
Richman, J.

We concur:

_____
Kline, P.J.

_____
Miller, J.

*Yurasek v. Kesala* (A158859)