Filed 5/27/26; Certified for Publication 6/25/26 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| R.M., Plaintiff and Respondent, v. A.G., Defendant and Appellant. | B342515 (Los Angeles County Super. Ct. No. 24PDRO00642) |
| A.G., Plaintiff and Appellant, v. R.M., Defendant and Respondent. | B345395 (Los Angeles County Super. Ct. No. 24PDRO00817) |

APPEALS from orders of the Superior Court of Los Angeles County, Timothy Martella, Judge.  Reversed and remanded with directions.

Family Violence Appellate Project, Arati Vasan, Jodi Lewis, Jennafer Dorfman Wagner, Craig E. Stewart; Jones Day, Nathaniel P. Garrett and Sam N. Silva for Defendant and Appellant and for Plaintiff and Appellant A.G.

Eric J. Olson, Michele T. Ferroni and Mary Louise Byrne for Plaintiff and Respondent and for Defendant and Respondent R.M.

_____

**INTRODUCTION**

Former boyfriend, R.M., and former girlfriend, A.G., each sought a domestic violence restraining order (DVRO) against the other pursuant to the Domestic Violence Prevention Act (DVPA) (Fam. Code, § 6200 et seq.).[1]  Following a combined evidentiary hearing on both petitions, the court granted R.M.'s request and denied A.G.'s request.

A.G. now appeals both orders.  As to the denial of her DVRO request, she argues the trial court erred by, among other things, failing to consider whether indirect contact from R.M. disturbed her peace.  That indirect contact included R.M.'s social media postings that he knew A.G. and others would see which had phrases such as "A[.]G[.]ispsycho" "ketaminewhor[e]," "pleasekillurself," and "[A.G.'s male friend's name]nevermadeucum," and uninvited phone calls to A.G.'s

_____

[1] Unspecified statutory references are to the Family Code.

2

mother such as one in which R.M. disclosed that A.G. had worked as a stripper.

We agree that the court abused its discretion in refusing to consider this evidence, and reverse and remand for a new evidentiary hearing on A.G.'s DVRO request. Because the parties mutually sought DVROs against each other, we also direct the court to vacate the DVRO it granted in favor of R.M. against A.G. so that, as part of the new evidentiary hearing on both requests, it may determine whether one or both parties acted as the primary aggressor and/or primarily in self-defense. (See § 6305.)

## BACKGROUND

### A. Factual Overview

A.G. and R.M. met in May 2022 at Pasadena City College (PCC) where they took classes and R.M worked. By October 2022, they were a couple. He was 20 years old, and she was 34 years old. In 2023, they lived together for six to eight months. In September 2023, R.M. moved back into his mother's home. A.G. and R.M. broke up in November 2023 (according to A.G.) or December 2023 (according to R.M.); they both agree they saw each other at least twice in December 2023.

Both parties claim the other physically, verbally, and emotionally abused them during the relationship. A.G. claims that R.M. sexually assaulted her; R.M. claims that A.G. falsely accused him of rape. According to A.G., their final in-person confrontation occurred on December 17, 2023, when R.M. broke into A.G.'s home and assaulted her. The next day A.G. filed a police report. The police photographed bruises on A.G.'s neck, arms, and legs. A.G. later recanted her statement to the police.

3

There was evidence both parties used drugs during their relationship.  Between December 28, 2023 and February 13, 2024, R.M. attended a drug and alcohol abuse rehabilitation program and did not see A.G. in person.  Around that same time, A.G. attempted to communicate with R.M. over one thousand times by phone, text, or social media direct messages.  In the early morning hours of February 12, 2024, A.G. appeared outside of R.M.'s mother's home.  R.M. considered this blizzard of attempted contacts to be harassment.  During this same time, R.M. made various disparaging posts on social media about A.G. that we describe further below.

A.G. alleges that on January 2, 2024, she obtained a temporary restraining order (TRO) against R.M. but did not serve it.  On January 18, 2024, the court dismissed the case, purportedly at A.G.'s request.

On January 30, 2024, R.M.'s attorney sent a cease-and-desist letter to A.G. directing her to stop communicating with R.M. and to stop making defamatory statements about him to others.

On February 6, 2024, PCC notified R.M. that, at A.G.'s request, the college had instituted "a non-punitive, non-disciplinary" mutual no-contact order.  That order prohibited both direct and indirect contact, including through social media, between the parties.  As noted above, after this no-contact order A.G. texted R.M. multiple times and showed up at his house, and R.M. indirectly contacted A.G. repeatedly through social media.

## B.    R.M.'s Petition for a DVRO

On April 26, 2024, R.M petitioned for a DVRO against A.G. to protect himself and certain members of his family.  R.M. averred that on or about August 20 and 31, 2023, A.G. scratched

4

R.M's face and neck when she yelled at him and acted erratically because she wanted him to leave their home. The petition also provided evidence of repeated and unwanted contact from A.G. following their break-up in December 2023, including that A.G. went to his mother's home "many times" and attempted to contact him repeatedly through email and social media. R.M. claimed A.G. falsely accused him of rape, for which the police declined to bring charges. R.M. explained that A.G. had a history of mental health issues and was suicidal. He also asserted that because of his difficulties with A.G., he had to work remotely, although he was not sure if A.G. still attended PCC.

R.M. attached several exhibits to his petition. They included the cease and desist letter to A.G., the notice from PCC of the mutual no-contact order, photographs of R.M.'s face and neck with scratch marks, photographs from February 12, 2024 at approximately 1:45 a.m. showing A.G. at a door, and hundreds of pages of screen shots of text or social media direct messages and missed telephone calls from A.G. to R.M. or his mother. In one undated message, A.G. stated, "Is it that you want me to harass you? Don't you have enough evidence? Yeah I did it. I continue to do it. You can block me. I admit I don't have self-control. I have admitted it to everyone." "You win . . . ." "You also have plenty evidence [*sic*] to file a restraining order or whatever. Just block me."

On April 26, 2024, the court granted a TRO prohibiting A.G. from abusing, contacting, or coming within 100 yards of R.M. or his mother.

A.G. filed a response to R.M.'s petition. Among other things, that response asserted R.M. physically abused her and that to the extent she injured him it was in self-defense. She

5

recognized her messages to R.M. after December 18, 2023 were "incessant," "sometimes hostile," and "wrong," but said she ceased contacting him on March 29, 2024, a month before he filed his request for a DVRO. A.G. argued that if her messages to R.M. had truly disturbed his peace, he would have blocked her on social media sooner and not posted photographs on his social media to taunt her.

## C. A.G.'s Petition for a DVRO

On May 20, 2024, A.G. petitioned for a DVRO against R.M. A.G. alleged abuse by R.M. that included "harassment, humiliation, intimidation, violation of privacy, encourag[ing] suicide, [and] damag[ing] professional rep[utation]." The petition included a lengthy declaration from A.G. and numerous exhibits.

A.G. averred that between January and December 2023, R.M. physically and emotionally abused her. A.G.'s declaration detailed the alleged abuse by date, which we only partially summarize here. On February 25, R.M. forced A.G. to kneel on the ground, hit her on her head, screamed at her, pushed his thumbs into her eyes, pulled her hair, choked her by putting his hand and fingers into her mouth, and coerced her into having sex with him by threatening to otherwise continue to hurt her. On August 31 (one of the days R.M. claims that A.G. scratched his face), R.M. attacked and choked A.G. and kicked in the locked bedroom door, breaking it. On other occasions R.M. called A.G. degrading names, spit and urinated on her, restrained or trapped her while he screamed at her, and broke into her home. A.G. also alleged that in December 2023, after their break-up, R.M. repeatedly pressured her to have sex with him. She eventually acquiesced on December 17. She claims that later that day R.M. returned to her home, broke in, threw her to the floor and against

6

furniture, screamed at her while he pinned her down, tore her clothing, smashed her smartphone against the wall, and strangled her.

The exhibits to A.G.'s petition included signed statements from two neighbors, who on two separate occasions heard a commotion from A.G.'s apartment due to R.M.'s alleged violence against her. The exhibits also included two declarations from A.G.'s male friend. Those declarations described, among other things, that the friend got into an altercation with R.M. in late August 2023, when stopping R.M. from forcing his way into an apartment to see A.G. when she did not wish to see R.M.; shortly afterwards, R.M. sent the male friend a text stating, "Don't fuck w me boi" with a photograph of a hand holding a gun. A copy of the text and photograph are in the record.

A.G.'s petition also included screenshots of messages between the couple. In one such message from September 13, 2023, R.M. apologized for hurting her "emotionally and physically," and asking, "[p]lease give me one more chance." On September 24, 2023, R.M. sent a text message to A.G., admitting to breaking into her home and smashing A.G.'s phone because he "was just fed up." Photographs from December 18, 2023 showed bruises on A.G.'s neck, arms, and leg, a cellphone with a broken screen, and a broken door.

A.G. declared that in February 2024, R.M. publicly posted images and messages for her to see on his social media including photographs of his face and neck with scratch marks, A.G.'s male friend, A.G.'s phone number, and A.G. herself (including cropped photographs of her head, face, and bare shoulder purportedly taken while she was in the bath, asleep, or engaged in oral sex). R.M. also changed his username to phrases directed at her,

7

including "A[.]G[.]ispsycho" "ketaminewhor[e]," "pleasekillurself," and "[A.G.'s male friend's name]nevermadeucum." R.M.'s change of his username to "pleasekillurself" was made shortly after A.G. sent a message to R.M. asking him if he wanted her to kill herself. On another occasion, R.M. changed his Instagram username to be the same as the name of A.G.'s online business but ending with ".con" instead of ".com." In May 2024, he sent at least one request to a person acquainted with A.G. to follow that Instagram account. A.G. attached exhibits demonstrating these posts.

A.G. asserted that R.M. repeatedly telephoned A.G.'s mother and male friend. During one phone call, R.M. berated A.G.'s mother for being a bad parent and told her that A.G. had been a stripper.

On May 20, 2024, the court entered a TRO against R.M. prohibiting him from abusing, contacting, or coming within 100 yards of A.G.

## D. The Evidentiary Hearing and Rulings

On September 10, 2024, the court held a combined hearing on the parties' mutual DVRO requests. R.M. was represented by counsel and A.G. represented herself.

### 1. *R.M.'s Testimony*

R.M testified first. During his testimony, the court directed him and his counsel to focus on what "happened from December 2023 to today" (in other words, after the couple broke up) that "you think would make me restrain [A.G.]." The court repeatedly redirected R.M. whenever he attempted to talk about incidents during the parties' relationship.

R.M. testified that the last time A.G. tried to contact him was March 29, 2024, via direct messaging on social media.

8

Counsel elicited testimony from R.M. that he sent a cease-and-desist letter to A.G. on January 30, 2024.  R.M. explained, "she was incessantly reaching out to me . . . and she would make numerous [online] accounts, saying she was going to threaten me; she was going to spread false allegations to people that I knew personally."  R.M. also testified that he "told [A.G. he] wanted nothing to do with her.  [He] blocked her, changed phone numbers, changed [his] social media accounts, changed emails, to no avail.  It hasn't helped."  He further testified that between December 18, 2023 and March 2024, A.G. sent him over one thousand text messages or other communications and it was not until he sought a DVRO that she stopped doing so.  A.G.'s incessant contact caused R.M. to fear for his safety and the safety of his coworkers.

    2.    *A.G.'s Testimony*

When R.M. finished testifying, the court turned to A.G. and asked her, "Anything you want to tell me?  You can tell me anything to defend yourself on his request for a restraining order.  And you can also tell me why you need one against him."  A.G. responded that she wanted to start in December 2023.  The court interrupted her, saying, "I don't really want you to.  I'm not interested.  You guys had a relationship, bad or good or somewhere in between.  It ended a few years [*sic*] ago.[2]  I'm only interested in what's going on recently, and whether I need to restrain you from him, or him from you, or both."  At later points in her testimony, A.G. again attempted to discuss events in

---

[2] It is apparent this was an inadvertent misstatement as the court repeatedly stated elsewhere that the relationship ended in December 2023.

December 2023 and each time the court stopped her from doing so.

The court asked A.G. if she tried to contact R.M. a thousand times. She said she had. After A.G. again attempted to discuss what happened in December 2023, the court interrupted and said, "But he hasn't contacted you since. You've been trying to contact him."

The court asked A.G. why she needed to talk to R.M. in February 2024. A.G. responded that she contacted R.M. because she "was unwell." A.G. explained that when R.M. posted photographs of his scratched face on Instagram in February 2024, it triggered her. She also explained that R.M. called her mother a week later and told her mother that A.G. had been a stripper. The court responded that it did not sound like A.G. was done with the relationship "because of all of this contact over a year after you break up, all this contact you're trying to have with him. And the only time it stops is when he gets a temporary restraining order." A.G. denied this was the case, and said she stopped contacting R.M. about a month before he sought the DVRO. She explained that she filed a request for a DVRO against him because he changed his Instagram profile to impersonate her business. The court responded, "Do you think it would be better for you if you would just stop looking at his social media?" A.G. agreed it would be best and that she had stopped doing so.

3. *The Court's Rulings*

At the conclusion of the hearing, the court found that there was not sufficient evidence to issue a restraining order against R.M.: "[A.G.] described a bad relationship they had, but it was back in late 2023 when it ended. He's made no attempts to

10

contact her, although she's made—and she even agrees—a thousand attempts to contact him, along with going over to his mother's."  It granted R.M.'s request to restrain A.G., stating, "I don't think that [A.G.] will stop trying to contact him in the different ways she [has]."

A.G. timely appealed both the court's grant of R.M.'s DVRO and the denial of her request, and we consolidated the two appeals.

## DISCUSSION

A.G. argues the court prejudicially erred in not considering R.M.'s indirect contact with her in 2024, and in not considering evidence of abuse that occurred during the parties' relationship, as relevant to its determination of whether to grant her DVRO request.  We agree and, thus, need not reach her other claims of error.

### A.    Standard of Review

"We review the trial court's grant or denial of a DVPA restraining order request for an abuse of discretion."  (*In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 115.) " 'Judicial discretion to grant or deny an application for a protective order is not unfettered.  The scope of discretion always resides in the particular law being applied by the court, i.e., in the " 'legal principles governing the subject of [the] action . . . .' " ' [Citation.]  Thus, 'we consider whether the trial court's exercise of discretion is consistent with the statute's intended purpose.' [Citation.]  ' "If the court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, the court has not properly exercised its discretion under the law.  [Citation.]  Therefore, a discretionary

11

order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal. [Citation.]" [Citation.] The question of whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law [citation] requiring de novo review . . . .' " (*Id.* at p. 116.)

In reviewing any factual findings, we apply the substantial evidence standard of review. (*Curcio v. Pels* (2020) 47 Cal.App.5th 1, 12.) We "view the whole record in a light most favorable to the judgment, resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the decision of the trial court." (*Melissa G. v. Raymond M.* (2018) 27 Cal.App.5th 360, 373-374.)

## B.    The DVPA

The DVPA is intended "to prevent acts of domestic violence, abuse, and sexual abuse and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence." (§ 6220.) Courts may issue a restraining order to achieve this purpose upon "reasonable proof of a past act or acts of abuse." (§ 6300, subd. (a).)

As used in the DVPA, "[a]buse is not limited to the actual infliction of physical injury or assault." (§ 6203, subd. (b).) Instead, " 'abuse' means" "(1) To intentionally or recklessly cause or attempt to cause bodily injury. [¶] (2) Sexual assault. [¶] (3) To place a person in reasonable apprehension of imminent serious bodily injury to that person or to another. [¶] (4) To engage in any behavior that has been or could be enjoined pursuant to [s]ection 6320." (*Id.*, subd. (a).)

12

Section 6320 provides that a court may enjoin "a party from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, credibly impersonating as described in [s]ection 528.5 of the Penal Code, falsely personating as described in [s]ection 529 of the Penal Code, harassing, telephoning, including, but not limited to, making annoying telephone calls as described in [s]ection 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party." (*Id.*, subd. (a).)

" '[D]isturbing the peace of the other party' refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party. This conduct may be committed directly or indirectly, including through the use of a third party, and by any method or through any means including . . . [any] electronic technologies." (§ 6320, subd. (c).)[3] Courts do not "apply an objective, reasonable person standard when deciding whether a person has 'disturb[ed] the peace of the other party' within the meaning of section 6320. Instead, the relevant inquiry is simply whether the person against whom the DVRO is sought engaged in 'conduct that, based on the totality of the circumstances, destroy[ed] the mental or emotional calm of

_____

[3] While this appeal was pending, the Legislature amended section 6320 to specify that "electronic technologies" as used in subdivision (c) includes "connected devices as defined in [s]ection 22948.30 of the Business and Professions Code." (Stats. 2025, ch. 676, § 3, eff. Jan. 1, 2026.) As this amendment does not affect our analysis, for ease of reference we cite to the current version of the statute.

13

the other party.' " (*Parris J. v. Christopher U.* (2023) 96 Cal.App.5th 108, 121.)

"The DVPA requires a showing of past abuse by a preponderance of the evidence." (*In re Marriage of Davila & Mejia* (2018) 29 Cal.App.5th 220, 226.)  The party seeking the DVRO need not show a likelihood of future abuse.  (*Rodriguez v. Menjivar* (2015) 243 Cal.App.4th 816, 823.)  "The length of time since the most recent act of abuse is not, by itself, determinative. The court shall consider the totality of the circumstances in determining whether to grant or deny a petition for relief." (§ 6301, subd. (d).)[4]

"The Legislature designed the DVPA ' "to be exercised liberally," ' which is reflected by the statute's relatively low standard of proof that requires only ' "reasonable proof" ' of at least one past act of abuse.  [Citations.]  An overly restrictive application of the DVPA would lead to outcomes that run afoul of the Act's . . . intent." (*K.T. v. E.S.* (2025) 109 Cal.App.5th 1114, 1128.)

## C.  The Trial Court Erred in Refusing to Consider Evidence of R.M.'s Indirect Contacts with A.G.

As already referenced, section 6320, subdivision (c) broadly defines conduct that can disturb the peace of the protected party to include actions "committed directly *or indirectly*, including through the use of a third party, and by any method or through

---

[4] At the time of the evidentiary hearing, what is now subdivision (d) of section 6031 was set forth in subdivision (c) of that same section.  Effective January 1, 2025, it was renumbered as subdivision (d) without any substantive change.  (Stats. 2024, ch. 652, § 2, eff. Jan. 1, 2025.)

14

any means" that include "electronic technologies." (*Ibid.*, italics added.) "[T]he relevant inquiry is simply whether the person against whom the DVRO is sought engaged in 'conduct that, based on the totality of the circumstances, destroy[ed] the mental or emotional calm of the other party.'" (*Parris J. v. Christopher U., supra*, 96 Cal.App.5th at p. 121.)

Here, the court narrowly defined "contact" to include only direct contact. In explaining its rationale for denying A.G.'s DVRO request, the court stated that after the parties' relationship ended in late 2023, R.M. "made no attempts to contact her, although she's made—and she even agrees—a thousand attempts to contact him, along with going over to his mother's." The court similarly stated that R.M. "hasn't contacted [A.G.] since" December 2023 and that R.M. was "not trying to contact [her]."

The court's statements about R.M. making no attempt to contact A.G. are true only if the court excluded indirect contact from its consideration. As described above, that is not the statutory standard. Had the court considered A.G.'s evidence of indirect contact from R.M. as relevant, it may well have concluded that his indirect conduct should have been enjoined under the DVPA. A.G. provided substantial evidence that during roughly the same period she was attempting to contact R.M., R.M. was indirectly communicating with her in ways that disturbed her peace.

For example, A.G. provided evidence that R.M. telephoned A.G.'s mother and told her that A.G. was a stripper. Such disclosures of personal information to third parties can constitute abuse under the DVPA. (See *In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416, 1423; *In re Marriage of*

15

*Nadkarni* (2009) 173 Cal.App.4th 1483, 1498-1499.) There was also evidence that R.M. used electronic technology, namely social media, to disturb A.G.'s peace. (§ 6320, subd. (c).) R.M. changed his profile picture on social media to be photographs of A.G. taken during private moments. He changed his username to phrases calculated to taunt her. One such change included her full name and described her as "psycho." Others referred to her as a "whor[e]" or used similarly demeaning sexualized terms. Yet another changed his username to "pleasekillurself" in an apparent answer to her question about whether A.G. should do so. The timing of this change by R.M. makes little sense unless he anticipated that A.G. would see what R.M. posted or otherwise become aware of it.

In claiming this conduct did not constitute harassment or disturbance of A.G.'s peace, R.M. cites cases involving civil harassment restraining orders (CHROs) under Code of Civil Procedure section 527.6. Perhaps because R.M. incorrectly views this matter through the civil harassment lens, he argues this evidence "is hardly a pattern of harassment, and the temporary Instagram posts were simply posts on R.M.'s own account, not messages directed at A.G." R.M. also argues that phone calls or texts to people other than A.G. do not constitute contact with or harassment of A.G.

The standard for the issuance of a CHRO does not govern here. Courts exercise their discretion to grant a DVRO "more liberally than [their] discretion to restrain civil harassment generally," the abuse subject to restraint by a DVRO "is much broader than that which is defined as civil harassment," and a less stringent standard of proof applies to the issuance of a DVRO than the clear and convincing evidence standard applicable to

16

CHROs.  (*Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 334.)
As explained above, the DVPA is not limited to harassment or
direct contact, and the court must look at the totality of the
circumstances in deciding whether the person to be restrained
disturbed the peace of the petitioner.

R.M. also argues that the court denied A.G.'s request for a
DVRO because it did not find her credible.  To the extent the
court did not find A.G. credible, it was not because it disbelieved
the indirect contacts at issue had occurred.  A.G. provided
documentary evidence showing the social media posts and
corroborating the telephone calls, and R.M. has never disputed
that he made them.  The court denied A.G.'s DVRO request not
because it did not believe that R.M. posted about her on
Instagram or otherwise indirectly contacted her, but because it
did not consider that activity to be within the ambit of the DVPA.
That was error and requires a new evidentiary hearing.

**D.    Because the Parties Sought Mutual Restraining
        Orders, R.M.'s DVRO Also Must Be Reversed**

Because the parties sought mutual restraining orders, the
need for a new evidentiary hearing on A.G.'s request means that
we must also reverse the grant of R.M.'s DVRO.  This additional
reversal is necessary because the DVPA requires a court
considering mutual restraining order requests to evaluate the
totality of the relevant conduct between both parties before
issuing any restraining order.  That evaluation cannot occur here
unless the court rehears both requests and not just A.G.'s.

Section 6305 states, "The court shall not issue a mutual
order enjoining the parties from specific acts of abuse described
in [s]ection 6320 unless . . . [¶] . . . [¶] . . . [t]he court makes
detailed findings of fact indicating that both parties acted as a

17

primary aggressor and that neither party acted primarily in self-defense." (*Id.*, subd. (a)(2).) "[I]n determining if both parties acted primarily as aggressors, the court shall consider the provisions concerning dominant aggressors set forth in paragraph (3) of subdivision (c) of [s]ection 836 of the Penal Code." (*Id.*, subd. (b).) That Penal Code section states, "The dominant aggressor is the person determined to be the most significant, rather than the first, aggressor. In identifying the dominant aggressor, [one] shall consider (A) the intent of the law to protect victims of domestic violence from continuing abuse, (B) the threats creating fear of physical injury, (C) the history of domestic violence between the persons involved, and (D) whether either person involved acted in self-defense." (Pen. Code, § 836, subd. (c)(3).)

The determination of which party or parties are the primary aggressor "requires that the acts of the parties be weighed against each other. As a result, in deciding whether mutual restraining orders should issue, the trial court must consider the parties' respective alleged acts of domestic violence in concert, and not separately." (*K.L. v. R.H.* (2021) 70 Cal.App.5th 965, 979.) "By separating out for analysis each party's claim of abuse against the other, and issuing restraining orders against both parties as if incidents occurring at different times must be wholly unrelated, a court does not give full effect to the statutory directive that it 'shall consider' both 'the history of domestic violence between the persons involved' and 'protect[ing] victims of domestic violence from continuing abuse.' " (*Melissa G. v. Raymond M.*, *supra*, 27 Cal.App.5th at p. 372.)

A.G. argues and we agree that "[u]nder this analysis, even if a party's conduct might support a DVRO when viewed in

18

isolation, the trial court may still deny the DVRO if the court determines under the factors specified in section 6305 that the party was not a primary aggressor or acted primarily in self-defense." Thus, the DVRO in R.M.'s favor against A.G. must be vacated (even though, when viewed in isolation, substantial evidence supports it) so that the trial court may conduct an evidentiary hearing applying the requirements set forth in section 6305.

R.M. argues we should affirm the court's issuance of a DVRO in his favor, suggesting the court granted his request and not A.G.'s because it found she was the primary aggressor, in part because her abuse allegations were not credible. Nothing in the record indicates that the court undertook this analysis. If anything, the record suggests to the contrary; the court appears to have considered the alleged abuse in 2023 irrelevant as opposed to finding one or both of the parties' claims about it not credible. Even if we imply that it did make some type of credibility finding, it still misapprehended the legal standard for what constituted potential abuse by R.M. and thereby abused its discretion. (*In re Marriage of F.M. & M.M.*, *supra*, 65 Cal.App.5th at p. 116 [an order based on an incorrect legal assumption is not a proper exercise of discretion].)

## E. The Court Must Consider Evidence of Abuse During the Parties' Relationship

In holding a new evidentiary hearing, we lastly note that the court may not restrict the parties' evidence or its consideration of it only to what occurred after the end of their relationship in late 2023. The court must "consider the totality of the circumstances in determining whether to grant or deny" a DVRO request (§ 6301, subd. (d)), and not just conduct in the

19

most recent few months after the parties separated.  Further, given the mutual requests at issue here, the primary aggressor analysis requires considering "the history of domestic violence between the persons involved" (Pen. Code, § 836, subd. (c)(3)) and not just snippets of it.  (E.g., *K.L. v. R.H.*, *supra*, 70 Cal.App.5th at p. 979; *Melissa G. v. Raymond M.*, *supra*, 27 Cal.App.5th at p. 372.)

## DISPOSITION

The court's orders denying A.G.'s request for a DVRO and granting R.M.'s request for a DVRO are reversed, and the matters are remanded for the court to hold a new evidentiary hearing on both requests.  A.G. is awarded her costs on appeal.


WEINGART, J.


We concur:



ROTHSCHILD, P. J.



BENDIX, J.

Filed 6/25/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| R.M., Plaintiff and Respondent, v. A.G., Defendant and Appellant. | B342515 (Los Angeles County Super. Ct. No. 24PDRO00642) |
| A.G., Plaintiff and Appellant, v. R.M., Defendant and Respondent. | B345395 (Los Angeles County Super. Ct. No. 24PDRO00817) ORDER CERTIFYING FOR PUBLICATION |

The opinion in the above-entitled matter filed on May 27, 2026, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

_____

WEINGART, J.          ROTHSCHILD, P. J.          BENDIX, J.